## MASON *v.* LOVINS

1. INTOXICATING LIQUORS—DRAMSHOP ACT—EVIDENCE—URINALY-
SIS—ADMISSIBILITY.

> A urinalysis showing a 0.24% blood alcohol content, meaning
> that the specimen-giver was extremely drunk, was properly
> admitted in a dramshop action against defendant-consumer
> after that specimen was traced to, and identified as having
> been given by, him through the testimony of police officers
> who found defendant drunk at the scene of the accident in
> which plaintiffs' decedent was fatally injured, of one officer
> who not only took the specimen but also described his cus-
> tomary and invariable procedure in taking urine specimens
> from suspected drunks, of tagging the specimen with defend-
> ant's name, his own name, and the date, and of placing it in
> a locked cabinet which only the laboratory technician could
> open, of the laboratory technician, who analyzed the specimen,
> corroborating the officer regarding the identification and locked
> cabinet procedures customarily employed and of the defendant
> himself, who admitted that he could recall giving a urine
> specimen to a police officer at the accident scene.

2. EVIDENCE—WITNESSES—ROUTINE—ADMISSIBILITY.

> A witness who testifies that he always follows a particular proce-
> dure may, on that basis, testify that he did so in the case
> at hand, even though he has no independent recollection of
> following the procedure in the case at hand.

---

REFERENCES FOR POINTS IN HEADNOTES

[1–4] Admissibility and weight of evidence based on scientific test
for intoxication or presence of alcohol in system. 127 ALR
1513 s. 159 ALR 209.
[5, 6] 58 Am Jur, Witnesses § 796.
[7] 45 Am Jur 2d, Intoxicating Liquor §§ 582–585.
[8] 53 Am Jur, Trial § 904.
[9] 53 Am Jur, Trial § 485.
[10] 45 Am Jur 2d, Intoxicating Liquor § 564.

3. INTOXICATING LIQUORS—DRAMSHOP ACT—EVIDENCE—URINALYSIS—ADMISSIBILITY.

The taking of a urine specimen from defendant, found drunk at the scene of an accident, and its transmission to a laboratory technician for analysis was adequately established where defendant admitted that he gave such a specimen to a police officer at the accident scene and the officer who obtained the specimen testified that he invariably took a urine specimen from drivers in accident cases even though his accident report admittedly mentioned only a breathalyzer test and his recollection of obtaining the urine specimen had to be refreshed from his accident report and by his *modus operandi* in such cases.

4. INTOXICATING LIQUORS—DRAMSHOP ACT—EVIDENCE—URINALYSIS—WEIGHT—QUESTION OF FACT.

The weight to be given to a police officer's testimony regarding his habit of taking a urine specimen for blood alcohol analysis from automobile drivers involved in accidents, whether he actually obtained one from defendant and transmitted it, identified with defendant's name and the date, to a laboratory technician for analysis, and whether the specimen analyzed was the same one which defendant had provided on the night of the accident, were questions for the jury and in deciding the disputed issue of whether a urine specimen had been taken, the jury could properly consider in negation of the officer's testimony the fact that his accident report mentioned a breathalyzer test but not a urine specimen and that the laboratory technician had originally interpreted the date on the specimen bottle as being five days later than the accident date.

5. WITNESSES—OPPOSITE PARTY.

A party who calls an adverse party as a witness vouches for the adverse party to the extent that he cannot introduce an inconsistent statement of the adverse party or impeach the adverse party's credibility; however, the calling party is not bound by the adverse party's testimony and can introduce evidence contradicting that testimony.

6. INTOXICATING LIQUORS—DRAMSHOP ACT—WITNESSES—OPPOSITE PARTY.

Plaintiff guardian, by calling defendant driver as a witness, was not bound by his testimony that he had only a few beers in a defendant's tavern before an accident in which plaintiff's decedent received fatal injuries, and was free to show by other

evidence that defendant driver had been at the co-defendant's tavern, that he left for a relative's home, that it took him 30 to 45 minutes to arrive there, that even though he had nothing further to drink in that interval, he was still falling-down drunk when he arrived at his destination, and that to have become so deeply intoxicated he would have had to have drunk in excess of ten bottles of beer in the preceding three or four hours, thus leading to the jury's reasonable conclusion that defendant had drunk more than ten beers at defendant's tavern and had been sold beer at a time when he was already intoxicated.

7. INTOXICATING LIQUORS—DRAMSHOP ACT—UNLAWFUL SALE.

A tavern which, by an unlawful sale, contributes to a particular intoxication is liable under the dramshop act for damages caused by an intoxicated person during that intoxication; accordingly, the liability of a defendant tavern owner continued so long as there was no break in defendant consumer's intoxication between the time preceding the illegal sale through the time of an accident in which plaintiff's decedent received fatal injuries.

8. TRIAL — COMMUNICATION WITH JURY — POSSIBLE VERDICTS — ABSENCE OF COUNSEL.

Transmittal of a communication from the trial judge to the jury regarding the possible forms of verdict which could be rendered, as requested by the jury, without the knowledge and out of the presence of the parties' counsel, was irregular but not prejudicial where the communication was merely a list of the verdicts given to the jury at the close of the instructions and could not possibly prejudice any of the parties in any way.

9. INTOXICATING LIQUORS—DRAMSHOP ACT—ARGUMENT OF COUNSEL.

Suggestions by defense attorney during examination of defendant and another witness that defendant had drunk at bars other than defendant's tavern opened the door to plaintiff's argument that it was just as likely that defendant had returned to defendant tavern as to some other named bars; therefore plaintiff's argument was entirely legitimate and no error was committed in permitting that point to be argued where there was no evidence that defendant had returned to defendant tavern, but also no evidence that defendant had been drinking at other bars.

10. DAMAGES—WRONGFUL DEATH—INTOXICATING LIQUORS—DRAM-
SHOP ACT—JOINT TORTFEASORS—SETTLEMENT.

Refusal of trial court to instruct the jury that the wrongful
death settlement paid to plaintiff administrator by defendant
automobile driver should reduce proportionately any verdict
which might be rendered against defendant tavern owner in
a dramshop action brought by decedent's widow and child was
not error since the wrongful death and dramshop actions were
separate and distinct from each other in that plaintiff admin-
istrator could, in the wrongful death action, additionally re-
cover for pain and suffering of the decedent and the reason-
able medical, hospital, funeral and burial expenses for which
decedent's estate was liable while the widow and child could
recover only for loss of support.

Appeal from Kalamazoo, Van Valkenburg, J.
Submitted Division 3 March 4, 1970, at Grand
Rapids. (Docket No. 7,068.) Decided May 27, 1970.

Complaint by Lyle Mason, administrator of the
estate of John C. Carpenter, deceased, and guardian
of the estate of Gwendolyn Carpenter and Corinna
Sue Carpenter, minors, against Bobbie Lovins, De-
Jo Tavern, Inc., Fidelity and Deposit Insurance
Corporation, Harold Sage, operator of Joe's Tavern,
and St. Paul Fire and Marine Insurance Company
for wrongful death and an action under dramshop
act. Verdict and judgment for plaintiff against
Harold Sage and surety. Defendant Harold Sage
appeals. Affirmed.

*Cholette, Perkins & Buchanan* (*Sherman H. Cone*
and *Grant J. Gruel,* of counsel) and *Brown, Colman
& Dement,* for plaintiffs.

*Ryan, Boerma, Kail & Thompson,* for Harold Sage
and St. Paul Fire and Marine Insurance Company.

Before: R. B. BURNS, P. J., and FITZGERALD and
LEVIN, JJ.

LEVIN, J. John C. Carpenter was killed when his motorcycle was struck by an automobile driven by Bobbie Lovins.

Plaintiff commenced this action,

(1) as administrator of Carpenter's estate, against Lovins for wrongful death, and

(2) as guardian of Carpenter's wife and child, under the dramshop act[1] against two taverns, Joe's Tavern and De-Jo Tavern, Inc., and their sureties.

Plaintiff settled the wrongful death action against Lovins for $9,500 and the dramshop act action against De-Jo Tavern, Inc. for $5,000. The jury returned a verdict against Joe's Tavern of $47,500 for the widow and of $27,500 for the child. These verdicts were reduced $1,500 each by agreement of counsel because a judgment for $3,000 was being entered against the surety. Post-trial motions for judgment notwithstanding the verdict and a new trial were denied, but the judge ordered a *remittitur;* a judgment was entered for $44,000 in favor of the widow and $20,000 in favor of the child, and $3,000 against the surety.

Joe's Tavern appeals, claiming:

(a) evidence of a urinalysis should not have been admitted because the specimen was not properly traced and identified;

(b) there was insufficient evidence that it sold intoxicating beverages to Lovins while he was intoxicated;

(c) the judge erred when he communicated with the jury after it had retired to begin its deliberations without the knowledge or presence of counsel for the parties;

---

[1] MCLA § 436.22 (Stat Ann 1970 Cum Supp § 18.993). In *Ruediger* v. *Klink* (1956), 346 Mich 357, 366, the Michigan Supreme Court held that claims against the intoxicated consumer and the tavern which sold him the beverages may be joined and tried in one action.

(d) during his closing jury argument the plaintiff's attorney repeatedly suggested, without any supporting evidence in the record, that Lovins returned to Joe's Tavern between the time, many hours before the accident, he and others said he left it and the time of the accident;

(e) while the trial judge informed the jury of the $5,000 settlement with De-Jo's Tavern, Inc., he erred in refusing to advise it of the $9,500 settlement of the wrongful death action; and

(f) the verdict was contrary to the great weight of the evidence and a new trial should have been granted.

We affirm.

In an action under the dramshop act, the plaintiff has the burden of proving that the defendant tavern sold intoxicating beverages to a person who, at the time of sale, was already intoxicated, and that there is a causal connection between the unlawful sale and the injuries for which the plaintiff seeks to recover.[2]

The fatal accident occurred sometime between 10 and 10:30 on the night of July 2, 1964. Lovins began to drink 10 or 11 hours earlier. He was a construction worker. Because of bad weather he and other workers left a job site and arrived at Joe's Tavern sometime between 11 a.m. and 12 noon. They had lunch and each had three or more beers.[3]

---

[2] *Davis* v. *Terrien* (1961), 364 Mich 82; *Juckniess* v. *Supinger* (1949), 323 Mich 566, 572; *Schratt* v. *Fila* (1963), 371 Mich 238, 246.

[3] One of the co-workers said that he had possibly as many as five beers to drink. He didn't know how many beers Lovins had. He said Lovins may have drunk "a couple when we were bowling, I can't say."

The other co-worker said he drank three or four bottles of beer, that he didn't know how many beers Lovins drank but it could not have been as many as ten.

Lovins said he only had three or four beers at Joe's Tavern; he also testified that he did not recall precisely how much he drank there.

The men left the tavern sometime between 2 and 3 p.m., cleaned up the site and went home.

The foreman testified that Lovins did not appear intoxicated and had the weather permitted he would have allowed him to continue to work on scaffolding which was 40 feet above the ground. Lovins' luncheon companions testified that Lovins and they left the tavern around 2 o'clock and that Lovins did not appear to be drunk.

Lovins testified that after he left the job site he purchased a six-pack of beer at a grocery store, put it unopened in the trunk of his car and that he then drove to his uncle's home which is located 30 to 45 minutes traveling time from the job site.

Lovins' uncle testified that Lovins arrived sometime between 3:30 and 4:30 p.m. and that he was so deeply intoxicated he fell to the floor, and that, although he had nothing to drink at the uncle's house, an hour later the uncle and a neighbor had difficulty assisting him into an automobile and that, because of his condition, the uncle drove him home.

Lovins said he did not return to Joe's Tavern after he left it and that he did not have anything to drink between the time he left the tavern and the time he arrived at his uncle's home. At the trial he had no recollection of having had anything to drink on the day of the accident other than at Joe's Tavern, but conceded the truth[4] of his earlier pretrial deposition testimony that he drank one beer at his uncle's house and three beers after he arrived at his own home and one beer at his father-in-law's home later on in the evening and might have drunk some beer at the De-Jo Tavern shortly before the accident.

Police officer Bullock testified that he had an independent recollection of the accident, but that he

[4] See *Schratt* v. *Fila, supra,* p 244.

was somewhat dependent on an accident report which he and another officer prepared to refresh his recollection of what he did following his arrival at the scene of the accident. He said that Lovins was intoxicated at the time of the accident; another police officer who was at the scene also testified that Lovins was intoxicated at that time.

While at several points during his testimony Bullock said that he had an independent recollection of taking a urine specimen from Lovins, at other times he said he had no independent recollection of taking the specimen and that, in testifying that he had taken such a specimen from Lovins, he was relying on the written report and his *modus operandi* in such cases. His attention was then directed to the fact that the accident report, while mentioning that a breathalyzer test had been taken, did not say anything about a urine specimen. Bullock acknowledged this to be true, but said that in all suspected drunk cases it was his invariable procedure to take a urine specimen as well as a breathalyzer test and on that basis he was sure he had done so in this case.

Lovins recalled voiding urine into a glass jar. Bullock testified that such a specimen jar would be tagged, he would sign the tag and place it in a locked cabinet which no one other than the laboratory technician could open, and he was sure he followed these procedures in this case.

The laboratory technician testified that he removed from the locked cabinet a urine specimen tagged "Bobbie Lovins," bearing Bullock's name and a date which he originally interpreted as July 7, 1964, but which he subsequently reinterpreted as July 2, 1964, and that, upon analysis, the specimen showed a blood alcohol content of 0.24%.[5]

_____

[5] A toxicologist testified that to register 0.24 at the time of the accident Lovins would have had to have consumed a minimum of 18 bottles of beer.

Both the laboratory technician and a toxicologist stated that a person with 0.24% blood alcohol would be extremely drunk. The toxicologist added that considering the food consumed by Lovins at Joe's Tavern he would have had to have drunk in excess of ten beers to have become so inebriated that he could not stand up at 4:30.[6] And that, while it would have been difficult to drink as many as ten beers in two hours' time, in four hours' time some men could do so.

We think that the taking and transmission to the laboratory technician of the urine specimen was adequately established. Lovins testified that he gave such a specimen and, while Bullock had no independent recollection of taking it, his testimony that he invariably took a urine specimen adequately supports his statement that he did so in this case.

Bullock testified that the accident report refreshed his recollection and that he independently recalled two groups of facts.[7] Firstly, that there was an accident, that he found Lovins at the scene and he was intoxicated, and that he, Bullock, dealt with Lovins in accordance with the procedures he consistently followed in dealing with suspected drunk-driving cases. Secondly, that the procedure he always followed in such a case included the taking of a urine specimen and tagging and placing it in the laboratory technician's locker. The silence of the accident report regarding a urine specimen or urinalysis tends to support Bullock's claim that he

---

[6] In *Higdon* v. *Kelley* (1954), 339 Mich 209, 215, the Michigan Supreme Court took judicial notice that the consumption of 10 to 12 glasses of beer in an afternoon was sufficient to cause intoxication. In *Schratt* v. *Fila, supra,* pp 241, 247, the Court said there was sufficient evidence of intoxication to go to the jury where the testimony tended to show consumption of 7 or 8 bottles of beer in an afternoon.

[7] McCormick on Evidence, § 9, p 14. *Cf.,* as to past recollection recorded, McCormick on Evidence, ch 31, p 590; *Fisher* v. *Kyle* (1873), 27 Mich 454; *People* v. *Hobson* (1963), 369 Mich 189.

independently recalled his asserted habit of invariably taking such a specimen.

There are many tasks that are performed routinely, and while, as held in *Bauer* v. *Veith* (1964), 374 Mich 1, 3, it may not be presumed that because an official is obliged to take a specimen that he in fact did so,[8] where, as here, the witness testifies that he always follows a particular procedure, he may on that basis testify that he did so in the case at hand. We stress that Bullock testified as to the standard procedures which he followed, not merely the procedures generally followed in his department.

Any other rule would make it difficult, if not impossible, in many cases to prove that what is routinely done has been done in a particular case. It is understandable that where a task has been performed on countless occasions the actor cannot recall doing it on a specific occasion.

In *Interstate Life & Accident Insurance Company* v. *Whitlock* (1965), 112 Ga App 212 (144 SE2d 532), in response to the objection that since the witness couldn't "remember the disposition of this *particular* sample, the testimony as to what he routinely does is inadmissible" [emphasis by the Court], the Court of Appeals of Georgia responded (p 220):

"Although the medical examiner was unable to recall the disposition of the specific sample in question due to the large number of cases his office handles, he testified that he did not recall ever having departed from the established routine and there is no evidence of such departure, either in this particular case or any other. The evidence indicates

_____

[8] In the cited case the Michigan Supreme Court held that the various steps in the keeping and transportation of a specimen from the time it is taken until analysis must be traced or shown by evidence, and that the presumptions that official duty is properly performed and public records are correct will not supply missing links in the chain.

that the sample was handled according to established procedures and was not subjected to any delays in processing. *In our opinion it would be entirely unrealistic to expect or require a specific recall of each individual case where the volume of cases is so large and, in most instances, there is nothing out of the ordinary about any given case which would make it subject to special recollection."* (Emphasis supplied.)

In *Martin* v. *Smith* (1896), 108 Mich 278, an action on a promissory note, an assistant cashier of a bank testified that (p 281) "I mailed a notice of protest in this case on that day [to the maker of the note]. I do not remember of mailing it, but testify from my habit of mailing letters notifying indorsers when I make a protest on a note, as I did in this case." In response to the contention that the record did not show that notice of dishonor was given, the Michigan Supreme Court said (p 282):

"In our opinion, the effect of the testimony of [the assistant cashier] is that he does not remember of [*sic*] mailing the notice, and that he testified that he did so from his *memoranda* and his habit of mailing notices when, as in this case, he made certificate of protest. It was equivalent to saying that, from the certificate of protest made by him, which recites the fact, he had no doubt that he mailed the notice as therein stated. This was evidence tending to show notice."

Similarly, see *Michigan Universal C.I.T. Credit Company* v. *Schaefer* (1968), 10 Mich App 604, 608.[9]

[9] See *Alpena National Bank* v. *Hoey* (1937), 281 Mich 307, 311, 312, where the Court commented on a process server's testimony regarding his "practice in serving papers": "having served thousands of legal papers, [he] could not remember this particular service. Without explanation, it would have been suspicious if he had claimed remembrance of a service nine years before."

See, also, *Commonwealth* v. *Torrealba* (1944), 316 Mass 24 (54 NE2d 939); *Baldridge* v. *Matthews* (1954), 378 Pa 566 (106 A2d 809).

It was for the jury to decide whether to credit Bullock's testimony regarding his habit[10] of taking a urine specimen and whether Bullock did so in this case and, also, whether the specimen found in the locker by the laboratory technician was the specimen which Lovins provided on the night of the accident. The jury could reasonably conclude on the basis of Bullock's testimony regarding his asserted habit and the other evidence that Bullock did in fact take a urine specimen from Lovins on the night of the accident and tagged and placed it in the laboratory technician's locker.

In deciding the disputed issue, the jury could properly consider as negating Bullock's testimony the fact that the report mentioned the breathalyzer test and did not say anything about a urine speci-

---

[10] "Evidence of habit is admissible to show like conduct on the occasion in question." *Hoffman* v. *Rengo Oil Company, Inc.* (1969), 20 Mich App 575, 576 (that deceased habitually followed a set pattern in crossing the highway to obtain the daily paper). See, also, *Sisson* v. *Lampert* (1910), 159 Mich 509, 512; *Merrill* v. *Tinkler* (1910), 160 Mich 575, 577; *Churchill* v. *Mace* (1907), 148 Mich 456, 458; *Beasore* v. *Stevens* (1909), 155 Mich 403.

In negligence actions evidence of a litigant's habit has been admitted for the purpose of showing whether he exercised due care at the time of the accident. *Missouri P. R. Co.* v. *Moffatt* (1899), 60 Kan 113 (55 P 837) and *Stone* v. *Boston & M. R. Co.* (1903), 72 NH 206 (55 A 359) (plaintiff's habit of exercising care at a railway crossing to show that he was not contributorily negligent); *Jaquith* v. *Worden* (1913), 73 Wash 349 (132 P 33) (the defendant's habit of leaving his automobile unlighted on the street as a circumstance tending to prove that he did so on the night of the accident); *Mahoney* v. *New York C. R. Co.* (CA 2, 1956), 234 F2d 923 (evidence of a practice to tie cargo to a railroad car with wire when the car is loaded to show that such wire was on the car at the time of the accident); *Hodges* v. *Hill* (1913), 175 Mo App 441 (161 SW 633) (habit of rider of horse to ride it at a rapid rate of speed along the road where the accident occurred).

On the issue whether a carload of goods was delivered, evidence of the custom of the railroad company to place carload lots consigned to the defendants on the spur track immediately adjacent to their plant is admissible. *Austin* v. *Knell* (1915), 188 Mich 100. *Cf. Werney* v. *Reid* (1922), 219 Mich 257, 264, 265.

See, generally, on the admissibility of testimony regarding a person's habit, McCormick on Evidence, § 162, p 340; 1 Wigmore on Evidence (3d ed), § 92, p 519; Model Code of Evidence, § 307, p 189; 1 Jones, Law of Evidence (5th ed), § 191, p 332.

men or a urinalysis and also the laboratory technician's original misinterpretation of the date. However, it could also reasonably conclude that the failure of the report to mention the urine specimen was an oversight and that the numbers 7 and 2 are sufficiently similar so that one might have been misread for the other.

The plaintiff was not bound by Lovins' testimony that he had only three or four beers in Joe's Tavern. By calling Lovins as one of his witnesses, the plaintiff vouched for him to the extent that he could not introduce an inconsistent statement or impeach his credibility.[11] But the plaintiff was, nevertheless, free to show by other evidence that the true facts were different than those testified to by Lovins.[12]

The favorable-to-the-plaintiff's view of the evidence is that Lovins left Joe's Tavern at 3 o'clock, that it took 30 to 45 minutes to drive to his uncle's home and that he arrived within an hour after he left the tavern without having had anything to drink in the interval. That, nevertheless, he was falling-down drunk when he arrived at his uncle's house and to have become so deeply intoxicated he would have had to have drunk in excess of ten bottles of beer in the preceding three or four hours.

The jury could reasonably conclude on such a record that Lovins had nothing to drink before reaching his uncle's house other than at Joe's Tavern and that he had drunk more than ten beers at the tavern and that the tavern sold him beer at a time when he was already intoxicated.[13]

---

[11] See 5 Callaghan's Michigan Pleading & Practice (2d Ed), § 37.217, p 574.

[12] *Osborn* v. *League Life Insurance Company* (1969), 20 Mich App 19, 21.

See, also, *Schratt* v. *Fila, supra,* fn 2.

[13] Intoxication can be established by circumstantial evidence. See *Grinstead* v. *Anscer* (1958), 353 Mich 542. See, also, *Fletcher* v. *Flynn* (1962), 368 Mich 328; *Eisenzimmer* v. *Contos* (1967), 379 Mich 656. See, also, the cases cited in footnote 6.

Under the dramshop act, a tavern which, by an unlawful sale, "contributes" to a particular intoxication is liable for damages caused during that intoxication by the intoxicated person.[14] Accordingly, even if Lovins would not have remained intoxicated at the time of the accident but for the drinks he consumed after he left the tavern, the liability of the tavern continues as long as there was no break in the intoxication between the time preceding the illegal sale through the time of the accident.[15]

The toxicologist testified that once Lovins reached a state of intoxication, consumption of only one bottle of beer per hour thereafter would cause him to remain in the same state of intoxication. Having

---

*Kaminski* v. *Grand Trunk W. R. Co.* (1956), 347 Mich 417, relied upon the plaintiff, dealt with alternative causal theories. Here, it is undisputed that the accident was caused by Lovins' negligent driving and it is not seriously disputed that he was intoxicated at the time of the accident. Nor is it contended that the tavern was relieved of the legal responsibility that would have attached by reason of an unlawful sale because of Lovins' beer drinking after he left Joe's Tavern. (See footnote 15 and accompanying text). The principal disputed factual question is whether the tavern sold the defendant beer at a time when he was already intoxicated and, on this record, that presents a question of the reasonableness of the inference that Lovins was intoxicated before the tavern sold him the last bottle of beer that he purchased from the tavern, not of choice between alternative causal theories.

[14] See footnote 1 for citation of act; *Larabell* v. *Schuknecht* (1944), 308 Mich 419, 423. See, also, *Fletcher* v. *Flynn* (1962), 368 Mich 328; *Hylo* v. *Michigan Surety Company* (1948), 322 Mich 568.

[15] See *Johnson* v. *Johnson* (1894), 100 Mich 326, 327.

A tavern owner is not liable if the intoxication to which he contributed is "separate and distinct" (*Merrinane* v. *Miller* [1909], 157 Mich 279, 283; *Barks* v. *Woodruff* [1882], 12 Ill App 96) from—if his unlawful sale "in no way contributed" (*Jewell* v. *Welch* [1898], 117 Mich 65, 66) to—the injury-causing intoxication.

In *Larabell* v. *Schuknecht*, *supra*, the Court reiterated the controlling principle (p 423):

"It is true that if each one of the tavern keepers was responsible for the intoxication or for contributing to it and the intoxication caused decedent's conduct resulting in death, suit could be brought against all who contributed to the *same intoxication* for all damages resulting to the plaintiff within the purview of the statute. 1 Cooley on Torts (3d ed), p 527, citing *Johnson* v. *Johnson*, 100 Mich 326; *Jewell* v. *Welch*, 117 Mich 65." (Emphasis supplied.)

Generally, see 45 Am Jur 2d, Intoxicating Liquors, § 582, p 872.

in mind the advanced state of intoxication testified
to by Lovins' uncle, the number of beers Lovins
admitted consuming between arrival at his uncle's
home and the time of the accident and the absence
of any evidence that he had become sober before the
accident,[16] the jury could justifiably conclude that
the state of intoxication which it found he was in
when he left Joe's Tavern continued until the time
of the accident.

After the jury had been deliberating for a period
of time the bailiff reported to the judge that it had
arrived at a decision and that it wished to see a list
of possible verdicts. The judge was then trying
another case, and, without notifying counsel for the
parties, in response he wrote on a slip of paper,
"No cause of action or judgment of X dollars for
the widow and judgment of X dollars for the child",
which was then delivered to the jury.

After the jury's verdict was announced the de-
fendant moved for a mistrial. The judge agreed
that responding to the communication from the jury
without the knowledge and out of the presence of
counsel for the parties "was irregular and was a
practice which should not be condoned but it was
merely a list of the verdicts given to the jury at
the close of the instructions and could not possibly
prejudice any of the parties in any way".

In *People* v. *Kangas* (1962), 366 Mich 201, the
Michigan Supreme Court condemned communica-
tions with the jury after its retirement for delibera-
tion in the absence of the parties or their counsel
and suggested, but did not hold, that such commu-
nications are grounds for a new trial without a
showing of prejudice. We are persuaded that an

---

16 *Cf.* McCormick on Evidence, § 309, p 642, n 8; 1 Jones, Law
of Evidence, (5th ed), § 66, p 117; *Cowgill* v. *Boock* (1950), 189
Or 282 (218 P2d 445).

inflexible rule requiring a new trial whenever there is any kind of communication, however innocuous, with the jury, without regard to the circumstances, has not been adopted.

In *Wilson* v. *Hartley* (1961), 365 Mich 188, the Court ruled that the transmittal of a communication relating to the form of the verdict from the judge to the jury in the absence of counsel was irregular but did not constitute prejudicial error.

In *People* v. *Schram* (1966), 378 Mich 145, 159, the Court reviewed the *Kangas* opinion; it is apparent from what was said in *Schram* that the observations of the *Kangas* Court must be read in the context of the facts there presented of an oral, off-the-record communication or instruction, "the contents of which was never fully reported", regarding a disputed issue in the sanctum of the jury room while it was still deliberating its verdict.[17] We are satisfied that what occurred in this case did not prejudice the defendant and that a new trial on this ground is not warranted.

During cross-examination Lovins was asked by the defendant's attorney if he remembered stopping at the Blue Note Bar, a bar close to Joe's Tavern. It was also brought out that two other bars, the Hide-A-Way and Tom & Chuck's Tavern, are located near the job site where Lovins had been working. In response to a question from the defendant's attorney, Lovins said he hadn't stopped at the Hide-A-Way bar for "a couple of beers."

During closing jury argument, plaintiff's attorney argued over objection that it was just as likely

---

[17] No opinion in this case was signed by as many as five justices. However, Justice Otis Smith's opinion was concurred in by two other justices and Justice Kelly, writing a separate opinion in which Justice Dethmers concurred, stated that he was in complete agreement with Justice Smith's opinion. Thus, a clear majority of the sitting Michigan Supreme Court limited the scope of the *Kangas* dictum.

that Lovins returned to Joe's Tavern as to the Hide-A-Way bar or some other bar.  The defendant contends that the argument was improper as there was no evidence that Lovins returned to Joe's Tavern.[18] There was no error.  Not only did the defendant fail to request a corrective instruction or a mistrial,[19] but, also, we think the argument was permissible under the circumstance that the defendants' attorney by his questions had suggested during the examination of Lovins and one other witness that Lovins had done some drinking at other bars.  Just as there was no evidence that Lovins had returned to Joe's Tavern, so too there was no evidence that he drank at the Blue Note or the Hide-A-Way or Tom and Chuck's; the plaintiff's argument was entirely legitimate.

In accordance with the rule of *Larabell* v. *Schuknecht* (1944), 308 Mich 419,[20] the jury was informed that, if it should decide that the plaintiff was entitled to recover damages, the amount of any award for the widow and the child should be reduced by the $5,000 amount paid in settlement by the De-Jo Tavern, a joint tortfeasor.  The trial judge did not err in refusing to give a similar instruction in regard to the $9,500 paid the plaintiff by Lovins to settle the wrongful death action.

Plaintiff's right of action as administrator of Carpenter's estate under the wrongful death act is separate and distinct from the widow's and child's rights of action under the dramshop act.  The wrongful death action could not have been brought by the wife and the child, and the dramshop actions could

---

[18] See *Scripps* v. *Reilly* (1877), 35 Mich 371, 390; *Hayes* v. *Coleman* (1953), 338 Mich 371, 382; *Kujawski* v. *Boyne Mountain Lodge, Inc.* (1967), 379 Mich 381.
[19] See *Keopel* v. *St. Joseph Hospital* (1968), 381 Mich 440; *Kujawski* v. *Boyne Mountain Lodge, Inc.*, *supra*.
[20] Similarly, see *Chunko* v. *LeMaitre* (1968), 10 Mich App 490, 497.

not have been brought by the administrator of Carpenter's estate.[21]

While the widow and the child may be the ultimate beneficiaries of all or a substantial portion of the $9,500 paid the administrator in settlement and there is some similarity between the kinds of damages compensable under the wrongful death and the dramshop acts,[22] the administrator could additionally recover for pain and suffering of the deceased person[23] and the reasonable medical, hospital, funeral and burial expenses for which his estate is liable.

No basis has been suggested for allocating the $9,500 settlement between the pecuniary loss of the widow and child and the other elements of damage for which the administrator could seek to recover. Additionally, the verdicts of the widow and child were reduced a total of $8,000 by remittitur. For the reasons stated, we have concluded that the failure to bring to the jury's attention the amount of the settlement was not reversible error. We intimate no opinion whether the concept applied in *Larabell* v. *Schuknecht* would be applicable to the portion of

[21] See *Genesee Merchants Bank & Trust Company* v. *Bourrie* (1965), 375 Mich 383, 389, 390. *Cf. Ruediger* v. *Klink, supra*, fn 1.

Compare *Virgilio* v. *Hartfield* (1966), 4 Mich App 582, where it was held that a tavern owner does not have a right of contribution against the intoxicated person because there is no common theory of liability of a tavern owner and of an intoxicated person to the plaintiff. See, also, *Duncan* v. *Beres* (1968), 15 Mich App 318, 324.

[22] Under the dramshop act a plaintiff wife, child or other person may recover for injury to person or property, "means of support or otherwise." MCLA § 436.22 (Stat Ann 1970 Cum Supp § 18.993). Under the wrongful death act the decedent's administrator may bring an action for the benefit of the surviving spouse and next of kin to recover for them damages "with reference to the pecuniary injury resulting from such death, to those persons who may be entitled to such damages when recovered, and also damages for the reasonable medical, hospital, funeral and burial expenses for which the estate is liable and reasonable compensation for the pain and suffering, while conscious, undergone by such deceased person during the period intervening between the time of the inflicting of such injuries and his death." MCLA § 600.2922 (Stat Ann 1970 Cum Supp § 27A.2922).

[23] Carpenter lived for five hours after the accident.

a wrongful death action settlement allocable to the pecuniary loss of a particular dramshop-act plaintiff in his action against joint tortfeasors who contributed to one, indivisible injury.

The trial judge did not abuse his discretion in deciding that the verdict was not contrary to the great weight of evidence.[24]

Affirmed. Costs to appellee.

All concurred.

---

[24] *Humphrey* v. *Swan* (1968), 14 Mich App 683, 689.