HASHEM v LES STANFORD OLDSMOBILE, INC

Docket Nos. 245939, 249977. Submitted February 15, 2005, at Detroit.
   Decided April 21, 2005, at 9:00 a.m. Leave to appeal sought.

   Al Hashem, as personal representative of the estate of Ronny
   Hashem, deceased, brought a wrongful-death and dramshop action
   in the Wayne Circuit Court against several parties, including Les
   Stanford Oldsmobile, Inc.; Mohamad Bazzi; Hassan Bazzi; Shina
   Inc., doing business as Sak's Party Store; and Huron Entertain-
   ment Corporation, doing business as Clutch Cargo's. The action
   arose out of a fatal automobile accident in which Mohamad Bazzi
   was the driver of, and the decedent a passenger in, an automobile
   owned by Les Stanford Oldsmobile. Hassan Bazzi, Sak's Party
   Store, and Clutch Cargo's reached "high-low" settlement agree-
   ments with the plaintiff by which the plaintiff would receive
   awards ranging between a minimum and a maximum, depending
   on the jury verdict. Those defendants continued to participate in
   the trial, however, and the court, Edward M. Thomas, J., declined
   to inform the jury of the settlement agreements. At the close of the
   plaintiff's proofs, Clutch Cargo's and Sak's Party Store were
   granted directed verdicts. After finding that Mohamad and Hassan
   Bazzi negligently caused the decedent's death, the jury appor-
   tioned fault by Mohamad Bazzi and Les Stanford Oldsmobile at
   seventy percent and by Hassan Bazzi at thirty percent. The jury
   awarded the plaintiff $1 million for noneconomic damages in-
   curred from the date of the decedent's death until the verdict, and
   $11 million for noneconomic damages for the remainder of 2002,
   but did not award future noneconomic damages for the remaining
   years of the decedent's estimated life. The court entered judgment
   on the jury's verdict, apportioning liability for the $12 million
   award in direct proportion to each defendant's percentage of fault.
   The judgment further provided that Mohamad Bazzi and Les
   Stanford Oldsmobile were jointly and severally liable for the entire
   award, but the court subsequently found that a release and
   satisfaction by Hassan Bazzi limited the liability of Mohamad
   Bazzi and Les Stanford Oldsmobile to their pro rata share. Les
   Stanford Oldsmobile and Mohamad Bazzi appealed. The plaintiff
   appealed by leave granted, and Les Stanford Oldsmobile cross-

appealed, the order limiting Les Stanford Oldsmobile's and Mohamad Bazzi's joint and several liability.

The Court of Appeals *held*:

1. The trial court erred by granting a directed verdict in favor of Sak's Party Store. The dramshop act, MCL 436.1801(3), gives an injured individual a cause of action against a liquor licensee that, by unlawfully selling alcohol to a minor, has caused or contributed to the intoxication that is a proximate cause of the damage, injury, or death. The evidence, when viewed in a light most favorable to the nonmoving parties, permits a legitimate inference that the alcohol Mohamad Bazzi purchased at Sak's Party Store and consumed caused or contributed to his intoxication, which was a proximate cause of the accident.

2. The trial court also erred by determining that Les Stanford Oldsmobile was jointly and severally liable for the entire jury award under MCL 600.6312(b)(iii). That statute retains joint and several liability for tort actions when the act or omission of a defendant causing death or injury involves the use of alcohol or a controlled substance and constitutes a crime for which that defendant is convicted. Because Mohamad Bazzi was convicted of operating a motor vehicle under the influence of intoxicating liquor and causing both death and serious impairment of a body function, he is subject to joint and several liability under the statute. That liability, however, is not imputed to Les Stanford Oldsmobile, which is vicariously liable under MCL 257.401(1) as the owner of the vehicle Bazzi was driving. Les Stanford Oldsmobile's consent to operate the vehicle did not constitute the cause of the decedent's death and is not a crime specified in MCL 600.6312(b)(iii). The trial court's erroneous grant of a directed verdict for Sak's Party Store and imposition of joint and several liability on Les Stanford Oldsmobile require reversal.

3. The integrity of the judicial system and the interest of fairness require disclosure to the jury of the true alignment of the parties. Thus, if settlement agreements similar to those entered into by the parties before trial are again reached on remand, they must be disclosed to the jury. Given the countervailing interests of encouraging settlements and avoiding prejudice to the parties by revealing matters such as the amount of a settlement or references to insurance, however, the trial court, exercising its sound discretion, must craft a means of disclosure that reasonably ensures fairness to all the litigants.

4. The trial court did not err by refusing to instruct the jury that Les Stanford Oldsmobile was liable only for Mohamad Bazzi's ordinary negligence. The plain language of MCL 257.401(1) im-

poses liability on Les Stanford Oldsmobile, as owner of the vehicle, for Bazzi's gross negligence or willful and wanton misconduct.

5. The trial court did not err by denying Mohamad Bazzi's motion for judgment notwithstanding the verdict. The wrongful-conduct rule, which generally bars a plaintiff's action that is based in whole or in part on the plaintiff's own illegal conduct, did not apply. Even if the decedent's unlawful purchase and consumption of alcohol before the accident constituted conduct sufficiently serious to warrant application of the rule, there was no causal nexus between that misconduct and his death.

6. The trial court did not err by admitting expert testimony concerning the effect of inflation on an award of damages. While MCL 600.6306(1)(e) requires that future noneconomic damages be reduced to present value, it does not require that the trial court perform that function if the jury has already done so.

7. Whether evidence concerning marijuana-related metabolites found during the autopsy of the decedent should be admitted at any trial on remand is left to the trial court's discretion following a proper offer of proof establishing relevance and probative value.

Reversed and remanded.                                      .

1. TORTS — JOINT AND SEVERAL LIABILITY — AUTOMOBILE OWNER'S LIABILITY.

Joint and several liability is imposed on a defendant for an act or omission causing death or injury that involves the use of alcohol or a controlled substance and constitutes a specified crime for which that defendant is convicted; the vicarious liability imposed on the owner of the vehicle driven by that defendant, however, is not joint and several (MCL 257.401[1], 600.6312[b][iii]).

2. COMPROMISE AND SETTLEMENT — SETTLEMENT AGREEMENTS — CONTINUED PARTICIPATION OF SETTLING DEFENDANTS — DISCLOSURE TO JURY.

A settlement agreement that provides for an award that depends on the verdict and that is entered into with a defendant who continues to participate at trial must be disclosed to the jury; the trial court, exercising its sound discretion, must fashion a means of disclosure that reveals the true alignment of the parties while avoiding prejudice to the parties and that reasonably ensures fairness to all the litigants.

3. NEGLIGENCE — AUTOMOBILES — OWNER'S LIABILITY.

The owner's liability statute imposes liability on the owner of a vehicle for permissive operation of the vehicle not only when the

operator is guilty of ordinary negligence, but also when the operator is guilty of gross negligence or willful and wanton misconduct (MCL 257.401[1]).

4. TORTS — PLAINTIFFS — WRONGFUL-CONDUCT RULE — LIMITATION OF PLAINTIFF'S ACTION.

   The wrongful-conduct rule, which generally bars a plaintiff's action that is based in whole or in part on the plaintiff's own illegal conduct, requires that the conduct be serious in nature and prohibited under a penal or criminal statute, and that there be a sufficient causal nexus between the plaintiff's illegal conduct and the asserted damages.

5. DAMAGES — FUTURE NONECONOMIC DAMAGES — REDUCTION TO PRESENT VALUE.

   The statute requiring that future noneconomic damages be reduced to present value does not require the trial court to make the reduction if the jury has already done so (MCL 600.6306[1][e]).

*Koory & Fakhoury, P.L.C.* (by *Walid Fakhoury*), and *Bendure & Thomas* (by *Mark R. Bendure*) for Al Hashem.

*Sommers, Schwartz, Silver & Schwartz* (by *Leonard B. Schwartz*) and *Gross, Nemeth & Silverman, P.L.C.* (by *James G. Gross*), for Les Stanford Oldsmobile, Inc.

*John P. Jacobs, P.C.* (by *John P. Jacobs* and *Norton T. Gappy*), for Mohamad Bazzi.

Before: HOEKSTRA, P.J., and CAVANAGH and BORRELLO, JJ.

HOEKSTRA, P.J. In these consolidated appeals, defendants Les Stanford Oldsmobile and Mohamad Bazzi (collectively referred to as "defendants") appeal as of right from a judgment, entered following a jury trial, awarding plaintiff Al Hashem, as personal representative of the estate of his son Ronny Hashem, $12 million as noneconomic damages on his claim for wrongful death.

By leave granted, plaintiff also appeals, and Les Stanford Oldsmobile cross-appeals, the trial court's postjudgment order limiting defendants' joint and several liability for satisfaction of the judgment to their pro rata share of comparative negligence, as determined by the jury. Because we conclude that the trial court erred by granting a directed verdict in favor of defendant Sak's Party Store, and by finding Les Stanford Oldsmobile to be jointly and severally liable for the entire award under MCL 600.6312(b)(iii), we reverse and remand.

## I. BASIC FACTS AND PROCEDURAL HISTORY

### A. THE ACCIDENT

This case arises from a July 1999 automobile accident in which a vehicle owned by Les Stanford Oldsmobile and driven by Mohamad Bazzi struck the rear of a tractor-trailer, then flipped, killing Ronny Hashem (the decedent) and seriously injuring Kassem Anani, both of whom were passengers in the vehicle at the time of the accident. Mohamad Bazzi, who was intoxicated at the time of the crash, was subsequently convicted of negligent homicide, MCL 750.324, and one count each of operating a motor vehicle under the influence of intoxicating liquor and causing death, MCL 257.625(4), and operating a motor vehicle under the influence of intoxicating liquor and causing a serious impairment of a body function, MCL 257.625(5).

At the May 2002 trial in this case, it was shown that, before his death, the decedent was one of a group of five teenaged friends consisting of himself, Mohamad Bazzi, Kassem Anani, Sammy Johair, and defendant Hassan Bazzi.[1] On the night of the accident, the group had

---

[1] For ease of reference, each of these individuals will be referred to by his first name.

made plans to attend a weekly "teen night" at defendant Clutch Cargo's, a Detroit-area dance club frequented by the group. In accordance with these plans, Mohamad, Kassem, and the decedent traveled in Mohamad's new Chevrolet Camaro convertible to Sammy's home, where they met Sammy and Hassan. Mohamad had received the Camaro from Les Stanford Oldsmobile the previous day and was in the process of purchasing the car from the dealership. It was not disputed at trial that, as the owner of the vehicle at the time of the accident, Les Stanford Oldsmobile was statutorily liable for any damages arising from the negligent operation of that vehicle by Mohamad. See MCL 257.401(1).

After meeting Sammy and Hassan, the group traveled to Sak's Party Store, with Kassem and the decedent riding with Mohamad in the Camaro and Sammy riding with Hassan in Hassan's late-model Chevrolet Corvette. At approximately 10:45 p.m., the group arrived at the store, where Mohamad purchased two twenty-two ounce bottles of malt liquor and Kassem and the decedent each purchased gin and orange juice. Mohamad testified that this was not the first time he and the decedent had been to Sak's Party Store, where it was known to all his friends that a minor could unlawfully purchase alcoholic beverages simply by paying a surcharge of between $2 and $3. After obtaining their beverages, Mohamad, Kassem, and the decedent left the party store for Clutch Cargo's, traveling along northbound Interstate 75 (I-75). Sammy and Hassan, who were to join the others at Clutch Cargo's later that evening, went first to a "downtown" bar.

Once on I-75, Mohamad began drinking the first of his two beers, while Kassem and the decedent shared the gin and orange juice. However, on the way to the club, Kassem and the decedent began feeling sick,

prompting Mohamad to stop by the side of the freeway to allow them to vomit. At trial, there was a conflict in the testimony regarding what exactly occurred along the side of I-75. According to Mohamad, the trio decided to throw their remaining alcohol away, including Mohamad's second, unopened beer, after which there was no alcohol left in the vehicle. Mohamad further claimed that he consumed no more alcohol that night. Kassem, however, recalled Mohamad drinking the entire way to the club, and also recalled seeing Mohamad consume what he believed to be alcohol while at the club. The three then continued on to Clutch Cargo's, arriving at the club at approximately midnight.

After parking the Camaro, Mohamad, Kassem, and the decedent entered the club, where they were met by Sammy and Hassan approximately one hour later. At approximately 2:00 a.m., the group left the club together and drove to a nearby gas station, where Mohamad engaged in an admittedly heated and profane argument with the station attendant. Mohamad then got back into the Camaro with Kassem and the decedent, and left the gas station for home. None of the three occupants was wearing a seatbelt at that time.

Although acknowledging that he was mad following the argument with the station attendant, Mohamad denied that he was intoxicated when he left the station and testified that there was no reason for anyone to have taken his keys from him.[2] Mohamad further

---

[2] Hassan testified that, although angry, Mohamad was neither slurring his words nor staggering at that time. Nonetheless, Hassan acknowledged that because Mohamad was so upset, he was "a little bit concerned" about Mohamad and the safety of his passengers. Consequently, after Kassem and the decedent also expressed concern over Mohamad's behavior, Hassan attempted to persuade Mohamad to allow Sammy to drive Mohamad and the others home. However, when Mohamad became angry, Hassan decided to drop the matter in order to avoid an argument

testified that the last time he had consumed any alcohol that evening was sometime between 11:00 and 11:30 p.m. while en route to Clutch Cargo's and that, other than water, he had nothing to drink while at the club.

After leaving the gas station and entering southbound I-75, Mohamad accelerated to a speed of approximately ninety miles an hour. Mohamad testified that he knew that he was exceeding the posted speed limit of seventy miles an hour and recalled that the decedent put his seatbelt on shortly after he began speeding. Mohamad indicated at trial that he believed the decedent decided to put the seatbelt on because he was "scared." He could not, however, recall whether the decedent or Kassem ever asked that he slow down. In contrast, Kassem testified that both he and the decedent begged Mohamad to slow down, and that it was only after Mohamad failed to even acknowledge their pleas that the decedent put on his seatbelt.

Mohamad testified that as he drove in the far right-hand lane of southbound I-75, he spoke to no one, but recalled seeing Sammy and Hassan following in the Corvette. Mohamad denied that he was racing with Hassan, and recalled Sammy having motioned at one point for him to slow down. Mohamad did not, however, heed Sammy's appeal to reduce his speed. Shortly thereafter, Mohamad observed a tractor-trailer ahead of the Camaro, also traveling in the far right-hand lane. At trial, Mohamad estimated the tractor-trailer to have been traveling at a speed of between fifty-five and sixty miles an hour, and testified that when he first observed the tractor-trailer, the Corvette was in the center lane, to the left and just behind the Camaro. However, as he

with Mohamad. Mohamad then abruptly left the gas station in the Camaro and drove toward I-75, with Kassem and the decedent also in the car.

approached the tractor-trailer and attempted to pass by moving around that vehicle into the center lane, Hassan increased the speed of the Corvette in an apparent attempt to keep Mohamad behind the tractor-trailer and thereby force Mohamad to slow down. Mohamad testified that he could see Hassan waving at him to slow down, but that he chose instead to attempt to change lanes by "swerv[ing]" between the Corvette and the tractor-trailer. However, while he was attempting the maneuver, the Camaro struck the left rear wheel of the tractor-trailer, causing the Camaro to flip. Mohamad and Kassem "flew" out of the car. The decedent, however, was still belted into the vehicle and remained in the car as it flipped onto its top, then slid across the freeway and into the median.

Mohamad testified that he believed his attempt to pass would have been successful if the Corvette, which passed the Camaro just as the accident occurred, had not been obstructing his path.[3] He acknowledged, however, that it was his speeding that caused the accident and, thus, the decedent's death. Blood drawn from Mohamad approximately one hour after the accident indicated that, at the time of the draw, Mohamad had a blood-alcohol level of 0.11 grams per deciliter of blood.

### B. THE VERDICT AND POSTJUDGMENT PROCEEDINGS

Following the close of plaintiff's proofs, both Clutch Cargo's and Sak's Party Store were dismissed from the

---

[3] Both Sammy and Hassan denied that Hassan ever used the Corvette to attempt to stop Mohamad from passing the tractor-trailer, and estimated that the Corvette was approximately one hundred feet behind the Camaro at the time of the crash. Although this testimony was consistent with the accident reconstructionist's conclusion that the Corvette was traveling "somewhat towards the rear" of the Camaro at the time of the crash, eyewitness testimony placed the Corvette next to the tractor-trailer and slightly in front of the Camaro at the time of the crash.

suit on separate motions for a directed verdict. Mohamad and Hassan were found by the jury to have negligently caused the decedent's death. Although the decedent was also found to have been comparatively negligent, the jury concluded that the decedent's negligence was not a proximate cause of his death and apportioned fault by Mohamad and Les Stanford Oldsmobile at seventy percent and by Hassan at thirty percent. Plaintiff was awarded $1 million for noneconomic damages incurred from the date of the decedent's death until the verdict, and $11 million for noneconomic damages for the remainder of 2002. The jury, however, awarded no past or future economic damages, and no future noneconomic damages for the remaining years of the decedent's estimated life.

The trial court entered judgment on the jury's verdict. Although, as required by MCL 600.6304(3), the judgment entered by the trial court properly apportioned liability for the $12 million award in direct proportion to each defendant's percentage of fault as found by the jury, the judgment further provided that Mohamad Bazzi and Les Stanford Oldsmobile were also jointly and severally liable for the entire award. See MCL 600.6304(4) and MCL 600.6312(b)(iii).[4] However, the trial court later found that a release and satisfaction of judgment in the amount of $100,000 subsequently executed between plaintiff and Hassan Bazzi rendered all liability for Hassan's pro rata share of the judgment, i.e., $3.6 million, satisfied. Accordingly, the trial court

---

[4] As discussed more thoroughly in part II(B) of this opinion, although joint and several liability was essentially abrogated by tort-reform legislation enacted in 1995, MCL 600.6312(b)(iii) retains joint and several liability for cases in which an act or omission of a defendant that causes personal injury, property damage, or wrongful death is a crime involving the use of alcohol or a controlled substance and for which the defendant has been convicted.

ordered that the liability of Mohamad Bazzi and Les Stanford Oldsmobile for satisfaction of the $12 million judgment was thereafter limited to their pro rata share of negligence, i.e., $8.4 million, as determined by the jury. The instant appeals followed the trial court's subsequent denial of defendants' postjudgment motions for a new trial or judgment notwithstanding the verdict.

## II. ANALYSIS

### A. DIRECTED VERDICT IN FAVOR OF SAK'S PARTY STORE

Les Stanford Oldsmobile first argues that the trial court erred by granting a directed verdict in favor of Sak's Party Store. We agree.

As previously noted, both Clutch Cargo's and Sak's Party Store were dismissed from this suit on separate motions for a directed verdict following the close of plaintiff's proofs. In seeking a directed verdict, counsel for Clutch Cargo's argued that the lack of any evidence of a "direct sale" of alcohol to Mohamad by the club precluded any liability on its part under the dramshop act, MCL 436.1801. The trial court agreed and, after concluding that the evidence offered on that matter was not sufficient to sustain anything other than specula-tion that Mohamad was served alcohol by the club, directed a verdict in favor of the club.

Counsel for Sak's Party Store thereafter also sought a directed verdict in favor of the store. In doing so, the store's counsel argued that there had been no evidence to contradict Mohamad's testimony that, although he had purchased two bottles of beer at the store on the night of the accident, he had consumed the contents of only one of those bottles. Thus, counsel argued, given the testimony of toxicologist Edgar Kivela, Ph.D., that the highest resulting blood-alcohol level of 0.022 grams

per deciliter following consumption of that single beer would not have affected Mohamad's ability to drive, the evidence was insufficient to establish that the sale was a proximate cause of the accident in which the decedent was killed.

In response, counsel for Mohamad Bazzi noted that there was no dispute that Mohamad was intoxicated at the time of accident, or that he must have consumed more alcohol than he acknowledged during his testimony. Thus, counsel argued, a directed verdict in favor of the store was not warranted because Mohamad's testimony contradicted these facts and because, with the dismissal of Clutch Cargo's from the suit, the store was the only possible purveyor of the additional alcohol. Counsel for Les Stanford Oldsmobile also opposed the motion, noting that, during his testimony, Kassem Anani was inconsistent or otherwise unsure regarding whether Mohamad had consumed both bottles of the beer purchased at Sak's Party Store on the night preceding the accident. Counsel further noted that there remained an issue whether the fact that Mohamad might have consumed more alcohol after the alcohol he illegally purchased at Sak's Party Store severed any proximate cause attributable to the store. The trial court, however, granted the store's motion, ruling that in light of the toxicologist's testimony that, even had Mohamad consumed both beers purchased at Sak's Party Store while en route to the club, "he never would have reached the level of intoxication that was shown by his blood alcohol at the time that he was at the hospital and the blood test was done," the evidence was insufficient to establish that Sak's Party Store's unlawful sale of alcohol was a proximate cause of the decedent's death. We conclude that the trial court's decision to grant a directed verdict in favor of Sak's Party Store on this ground was error.

This Court reviews de novo a trial court's decision regarding a motion for directed verdict. In doing so, the Court must review the evidence and all legitimate inferences from the evidence in a light most favorable to the nonmoving party. "A motion for directed verdict . . . should be granted only if the evidence viewed in this light fails to establish a claim as a matter of law." *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003).

The dramshop act, MCL 436.1801, prohibits the sale of alcoholic liquor to minors. MCL 436.1801(2). The act also gives an injured individual a cause of action against the person or entity that sold the alcohol to the minor, provided "the unlawful sale is proven to be a proximate cause of the damage, injury or death . . . ." MCL 436.1801(3).[5] Specifically, the act provides:

> Except as otherwise provided in this section, an individual who suffers damage or who is personally injured by a minor or visibly intoxicated person by reason of the unlawful selling, giving, or furnishing of alcoholic liquor to the minor or visibly intoxicated person, if the unlawful sale is proven to be a proximate cause of the damage, injury, or death, or the spouse, child, parent, or guardian of that individual, *shall have a right of action in his or her name against the person who by selling, giving, or furnishing the alcoholic liquor has* **caused or contributed to the intoxication of the person** *or who has caused or contributed to the damage, injury, or death.* [*Id.* (emphasis added).]

In concluding that Sak's Party Store was entitled to a directed verdict for want of evidence to support that its unlawful sale of alcohol was a proximate cause of the accident in which the decedent was killed, the trial

---

[5] With regard to claims premised on the wrongful furnishing of alcohol by licensees, the dramshop act "provides the exclusive remedy for money damages against a licensee arising out of the selling, giving, or furnishing of alcoholic liquor." MCL 436.1801(10).

court relied on testimony from plaintiff's toxicology expert, who indicated that the alcohol consumed by Mohamad from that sale was itself insufficient to generate the blood-alcohol level indicated by the first postaccident blood draw, i.e., 0.11 grams of alcohol per deciliter of blood. However, as correctly argued by Les Stanford Oldsmobile, a licensee's liability under the dramshop act is not so limited. To the contrary, the act imposes liability on any licensee that, by the unlawful sale or furnishing of alcoholic liquor to a minor or visibly intoxicated person, has "caused or contributed" to the intoxication that is a proximate cause of damage, injury, or death. See, e.g., *Mason v Lovins*, 24 Mich App 101, 114; 180 NW2d 73 (1970).

In *Mason, supra* at 106, the defendant was involved in a fatal automobile accident several hours after having consumed alcohol at a local tavern. Evidence offered at trial in the subsequent dramshop action against the tavern showed that the defendant construction worker went to the tavern at sometime between 11:00 a.m. and 12:00 p.m. that day, after having left a worksite as a result of bad weather. While at the tavern, the defendant consumed "three or more beers" while dining with several coworkers. *Id.* The defendant's coworkers testified that the defendant did not appear to be intoxicated when the group left the tavern and returned to the worksite at approximately 2:00 p.m. to clean the site before going home. *Id.* at 107. The defendant testified that after helping his coworkers clean the worksite, he traveled to the home of his uncle, approximately thirty to forty-five minutes away. The defendant further testified that he did not return to the tavern after having left it, and that he had nothing to drink between the time he left the tavern and the time he arrived at his uncle's home. However, the defendant's uncle testified that the defendant arrived at his home sometime be-

tween 3:30 p.m. and 4:30 p.m. so "deeply intoxicated" that he "fell to the floor," prompting the uncle to drive the defendant home approximately one hour later. *Id.* A toxicologist testified that to have been so inebriated that he could not stand up at 4:30 p.m. that day, the defendant would have had to consume more than ten beers. *Id.* at 109. The toxicologist further testified that to have accumulated the 0.24 percent blood-alcohol level indicated by a urine sample taken from the defendant shortly after the accident, the defendant would have had to consume a minimum of eighteen bottles of beer. *Id.* at 108 n 5.

In affirming the jury's subsequent verdict in favor of the plaintiff in *Mason*, this Court found that, when viewed in a light most favorable to the plaintiff, the evidence at trial was sufficient to permit the jury to reasonably conclude that the defendant had nothing to drink before reaching his uncle's house other than what he drank at the tavern, that he had consumed more than ten beers while at the tavern, and that, therefore, the tavern had sold the defendant beer at a time when he was already intoxicated. *Id.* at 113. Relying on precedent from our Supreme Court, the panel further noted that the tavern's liability for that sale continued regardless of whether the defendant continued to drink after leaving the tavern:

> Under the dramshop act, a tavern which, by an unlawful sale, "contributes" to a particular intoxication is liable for damages caused during that intoxication by the intoxicated person. Accordingly, even if [the defendant] would not have remained intoxicated at the time of the accident but for the drinks he consumed after he left the tavern, the liability of the tavern continues as long as there was no break in the intoxication between the time preceding the illegal sale through the time of the accident. [*Id.* at 114.]

See, also, *Larabell v Schuknecht*, 308 Mich 419, 422-423; 14 NW2d 50 (1944); *Johnson v Johnson*, 100 Mich 326, 327; 58 NW 1115 (1894).

In this case, plaintiff's toxicologist testified that for the blood-alcohol level of 0.11 grams per deciliter registered approximately one hour after the accident, up to 0.022 grams of alcohol per deciliter could be attributed to the alcohol Mohamad purchased at Sak's Party Store and admittedly consumed. The toxicologist further testified that although a blood-alcohol level of 0.022 grams per deciliter would not have had a "significant" affect on Mohamad's ability to drive, "alcohol concentration even at levels as low as .02" grams per deciliter of blood will nonetheless affect the ability of a person's brain to process information received from the fives senses. The toxicologist also testified that with a blood-alcohol level of 0.11 grams per deciliter, a person would be "unable" to process this information and would take longer to react to a given situation. Specifically, the toxicologist testified that the person would be

> limited in what they can see because the processing center can't take all the information in. So as they're looking at something concentrating on a task, other things which are going on while they're concentrating on that task will disappear. They won't see things on the outside. As they look at something that's ahead of them, for instance, they will be unable to process the information as to how far away it is as rapidly as they should.

Further, given the toxicologist's testimony that Mohamad's body metabolizes alcohol at a rate of 0.02 grams per deciliter each hour, the blood-alcohol level attributable to consumption of only one of the beers purchased at Sak's Party Store could have been as high as 0.042 grams of alcohol per deciliter at the time of the crash. Moreover, contrary to plaintiff's assertion, Kas-

sem Anani's testimony that Mohamad drank during the entire drive to Clutch Cargo's directly contradicts Mohamad's claim that he threw out all the alcohol after stopping to allow his friends to vomit along the side of I-75. When viewed in a light most favorable to the nonmoving parties, this evidence permits a legitimate inference that Mohamad consumed more than the one bottle he claimed, and that his consumption of that alcohol, at the very least, contributed to the intoxication. *Sniecinski, supra* at 131.

Although Mohamad claimed at trial to have struck the tractor-trailer only because he was "cut off" by Hassan with the Corvette, other testimony and evidence offered at trial indicates that Mohamad appeared to have misjudged his speed and distance relative to the tractor-trailer. When viewed in a light most favorable to the nonmoving parties, the foregoing testimony was sufficient to permit a jury to conclude that the unlawful sale of alcoholic liquor by Sak's Party Store "caused or contributed" to Mohamad's intoxication at the time of the accident, and that the intoxication was a proximate cause of the accident. *Mason, supra* at 114. Accordingly, we conclude that the trial court erred by granting a directed verdict in favor of the party store. *Sniecinski, supra* at 131. Moreover, because, as will be explained next, the trial court similarly erred by finding Les Stanford Oldsmobile jointly and severally liable for the judgment at issue here, the error was not harmless.

### B. JOINT AND SEVERAL LIABILITY
### UNDER MCL 600.6312(b)(iii)

Les Stanford Oldsmobile also argues that the trial court erred by concluding that it is jointly and severally liable for the entire jury award pursuant to MCL 600.6312(b)(iii), which retains such liability when the act or omission of a defendant causing death or injury

involves the use of alcohol or a controlled substance and constitutes a crime for which that defendant has been convicted. Again, we agree.

It is not disputed that, having been convicted of operating a motor vehicle under the influence of intoxicating liquor and causing both death and serious impairment of a body function in violation of MCL 257.625, Mohamad Bazzi is subject to the joint and several liability provided for under MCL 600.6312(b)(iii). Whether this same liability is imputed to Les Stanford Oldsmobile, as the owner of the vehicle being driven by Mohamad at the time of these violations, presents a question of statutory interpretation, which this Court reviews de novo. *Solution Source, Inc v LPR Assoc Ltd Partnership*, 252 Mich App 368, 372; 652 NW2d 474 (2002).

"The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature," and "[t]he first step in determining legislative intent is to review the language of the statute itself." *Id.* at 372-372. "If the statute is unambiguous, the Legislature is presumed to have intended the meaning it plainly expressed and judicial construction is neither required nor permitted." *Id.* at 373.

MCL 600.6312 provides, in relevant part:

A defendant that is found liable for an **act or omission** that **causes** personal injury, property damage, or wrongful death is jointly and severally liable if *the defendant's act or omission is any of the following*:

* * *

(b) A crime involving the use of alcohol or a controlled substance for which *the defendant* is convicted and that is a violation of 1 or more of the following:

* * *

(iii) Section 625 of the Michigan vehicle code, Act No. 300 of the Public Acts of 1949, being section 257.625 of the Michigan Compiled Laws. [Emphasis added.]

As indicated by the emphasized language, the statute imposes joint and several liability under circumstances where a defendant has been found liable for an act or omission that "causes" personal injury, property damage, or wrongful death, but only if that "act or omission" constitutes a specified crime for which that defendant has been convicted. Plaintiff correctly points out that, by use of the indefinite article "a" at its outset, the statute draws in any defendant "that is found liable for an act or omission that causes personal injury, property damage, or wrongful death . . . ." However, use of the definite article "the" in the body of the statute and again in subsection b limits that liability to a particular defendant, i.e., one whose "act or omission" constitutes an enumerated offense for which that defendant has been convicted. See *Hagerman v Gencorp Automotive*, 457 Mich 720, 728-729; 579 NW2d 347 (1998) ("the" is an article that particularizes the subject spoken of by reference to that certain object).

Les Stanford Oldsmobile's liability for the decedent's death derives from the owner's liability statute, MCL 257.401(1), which imposes liability on the owner of a motor vehicle "for an injury caused by the negligent operation of the motor vehicle . . . ." However, as recognized by our Supreme Court in *Roberts v Posey*, 386 Mich 656, 662; 194 NW2d 310 (1972), the owner's liability statute "makes the owner liable, not because he caused the injury, but because he permitted the driver to be in a position to cause the injury." As such, the "act or omission" for which the dealership was found to be liable, i.e., express or implied consent to operate the vehicle, does not constitute the "cause" of the death at

issue here within the meaning of MCL 600.6312(b)(iii). See *Roberts*, *supra* at 662. Moreover, even were we to conclude that such knowledge or consent constitutes an "act or omission that causes" death or personal injury within the meaning of MCL 600.6312(b)(iii), such an act or omission simply is not one of the specified crimes the statute requires a particular defendant to be convicted of before joint and several liability is imposed.

Plaintiff nonetheless asserts that the liability imposed under the owner's liability statute is vicarious in nature and that, therefore, there is no distinction between Les Stanford Oldsmobile and Mohamad Bazzi for purposes of applying MCL 600.6312(b)(iii). However, that argument is not borne out by the plain language of MCL 600.6312(b)(iii), which we must enforce as written. See *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 63; 642 NW2d 663 (2002); see also, e.g., *People v Hock Shop, Inc*, 261 Mich App 521, 528; 681 NW2d 669 (2004) (if a statute contains no express provision for vicarious, criminal liability, a court may not read legislative intent to impose such liability into the statute). Consequently, we conclude that the trial court erred by finding Les Stanford Oldsmobile to be jointly and severally liable under MCL 600.6312(b)(iii).

Moreover, because the trial court erred both by granting a directed verdict in favor of Sak's Party Store and by finding Les Stanford Oldsmobile to be jointly and severally liable pursuant to MCL 600.6312(b)(iii), judgment in this matter must be reversed. These errors removed from the jury the ability to determine, as required by MCL 600.6304(1), any fault for the decedent's death attributable to Sak's Party Store's unlawful sale of alcohol to Mohamad Bazzi. See *Jones v Enertel, Inc*, 254 Mich App 432, 435-436; 656 NW2d 870 (2002). Because such a finding of fault would have

decreased any several liability of Les Stanford Oldsmobile, judgment in this matter must be reversed.

### C. OTHER ISSUES

#### 1. PRETRIAL AGREEMENTS RESPECTING SETTLEMENT

Although we have concluded that the trial court's decision to grant a directed verdict in favor of Sak's Party Store constitutes an error requiring reversal, we find it appropriate to provide guidance with regard to several issues that may arise on remand. In doing so, we first address the argument of Les Stanford Oldsmobile and Mohamad Bazzi concerning the trial court's refusal to inform the jury of settlement agreements made between plaintiff and Hassan Bazzi, Clutch Cargo's, and Sak's Party Store. Defendants argue that the failure to disclose these agreements to the jury, while allowing these codefendants to participate at trial, subverted the adversarial process and denied them a fair trial. The question whether, and to what extent, juries should be informed of agreements of the type at issue here is one of first impression in this state.

At the outset of trial, the parties were ordered to disclose to the trial court whether any settlement agreements had been reached and, if so, the terms of those agreements. Counsel for Clutch Cargo's disclosed that it had reached a "high-low" agreement with plaintiff under which plaintiff would receive a minimum award of $25,000 and a maximum award of $50,000, depending on the verdict following trial. Counsel for Hassan Bazzi disclosed a similar agreement with plaintiff under which plaintiff was guaranteed a minimum award of $90,000 and a maximum award of Hassan's insurance policy limit of $100,000. A third agreement, also called a "high-low" agreement by the parties, was

disclosed by counsel for Sak's Party Store. However, under the terms of that agreement, plaintiff was to receive the store's insurance policy limit as both the "high" and the "low" amounts. According to plaintiff, no releases had been executed for these agreements before trial.

Counsel for Mohamad Bazzi and Les Stanford Oldsmobile questioned the propriety of the continued participation of the settling codefendants without disclosure of the agreements to the jury. The trial court, however, indicated that the agreements were not relevant, and declined to inform the jury of their existence. On appeal, defendants argue that the trial court's failure to inform the jury of these *Mary Carter*-style" agreements denied them a fair trial.[6]

In *Smith v Childs*, 198 Mich App 94, 97-98; 497 NW2d 538 (1993), this Court stated:

> The distinguishing characteristics of a *Mary Carter* agreement are that it (1) not act as a release, so the agreeing defendant remains in the case, (2) is structured in a way that it caps the agreeing defendant's potential liability and gives that defendant an incentive to assist the plaintiff's case against the other defendants, and (3) is kept

---

[6] As explained by our Supreme Court in *Rogers v Detroit*, 457 Mich 125, 150 n 22; 579 NW2d 840 (1998), overruled on other grounds by *Robinson v Detroit*, 462 Mich 439 (2000):

The term *"Mary Carter* Agreement" as defined by Black's Law Dictionary (6th ed) arises from the agreement popularized by the case of *Booth v Mary Carter Paint Co*, 202 So 2d 8 (Fla App, 1967). It refers to an agreement between the plaintiff and some, but fewer than all, defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants. The extent of responsibility is usually in inverse ratio to the amount the plaintiff is able to recover against the nonagreeing defendant or defendants. In certain states, such agreements are void as against public policy, while, in others, they are permissible if disclosed to the jury.

secret from the other parties and the trier of fact, causing all to misunderstand the agreeing defendant's motives.

Although noting that other jurisdictions "have found that such agreements deny the nonagreeing defendants a fair trial," the panel in *Smith, supra* at 98, concluded that the agreement at issue there did not constitute a *Mary Carter* agreement and the panel, therefore, did not reach the issue of the propriety of such agreements in Michigan.[7] Defendants concede that the agreements at issue here are not prototypical *Mary Carter* agreements. Indeed, although the agreements were not disclosed to the jury and did not act as releases, they were not kept secret from the trial court or the nonsettling codefendants. See *id.* at 97-98. Nonetheless, as argued by defendants, an agreement that deprives a settling defendant of any significant financial interest in the amount recovered against any nonsettling defendant distorts the adversarial process and potentially undermines both the right to a fair trial and the integrity of the judicial system. See *id.* at 98. As stated by the Florida Supreme Court in *Dosdourian v Carsten*, 624 So 2d 241, 243 (Fla, 1993), quoting *Dosdourian v Carsten*, 580 So 2d 869, 872 (Fla App, 1991):

> "Under our adversary system a jury can usually assume that the parties and their counsel are motivated by the obvious interests each has in the litigation. That assumption is no longer valid when the parties have actually made an agreement to the contrary prior to trial. The fairness of the system is undermined when the alignment of interests in the litigation is not what it appears to be.

---

[7] Although similarly noting that such agreements deny a fair trial to those defendants who are not part of the agreement, the *Rogers* Court also did not reach the issue of the propriety of such agreements in Michigan, having concluded that there was "no direct evidence that a *Mary Carter* agreement was ever established." *Rogers,* n 6 *supra* at 151.

"Jurors are also deceived by being informed that they are resolving an existing dispute between parties that have already resolved their differences. In our view, this undermines the integrity of the jury system which exists to fairly resolve actual disputes between our citizens. Hence, even if the parties and counsel conduct themselves with honesty and integrity, a cloud of doubt remains over the proceedings because of the information withheld from the jurors."

As recognized by the language quoted above, the primary danger of such an agreement is that the settling defendant will fail to operate as an adversary. This is most significantly a danger in the traditional *Mary Carter* agreement, where the settling defendant has reason to inflate the damages of the plaintiff because that party's exposure is reduced proportionally to the full amount of damages awarded. However, this distortion is also present when a defendant has fully settled, as Sak's Party Store clearly had, yet remains involved in the litigation. It may also be present, although in a subtler form, when a defendant has reached a "high-low" agreement, yet remains involved in the litigation.[8] See *Dosdourian, supra,* 624 So 2d at 247. With respect to these latter agreements, the distortion of the adversarial process is arguably less pronounced because, given the range of awards provided for in a "high-low" agreement, the settling defendants retain an interest in ensuring that the total amount of damages is as small as possible.

---

[8] Plaintiff argues that "high-low" agreements such as those at issue here are "commonplace in modern high stakes litigation," and have been recognized by this Court "without reproach." However, each of the cases relied upon by plaintiff as support for this proposition involved agreements entered into by all parties to the suit. See, e.g., *Phillips v Mirac, Inc,* 251 Mich App 586, 588 n 2; 651 NW2d 437 (2002), aff'd 470 Mich 415 (2004). Consequently, the fairness of the adversarial process to a nonsettling defendant was not implicated, as it is here. Moreover, in none of those cases was the propriety of the agreement at issue on appeal.

Nonetheless, the integrity of the judicial system is placed into question when a jury charged with the responsibility to determine the liability and damages of the parties is denied the knowledge that there is, in fact, an agreement regarding damages between a number of the parties. Consequently, wise judicial policy must favor disclosure of such agreements to the jury.

It must be recognized, however, that the public policy of Michigan also favors settlements. *Stefanac v Cranbrook Ed Community (After Remand)*, 435 Mich 155, 163; 458 NW2d 56 (1990). Moreover, as noted by our Supreme Court in *Brewer v Payless Stations, Inc*, 412 Mich 673, 678; 316 NW2d 702 (1982), jury disclosure of the fact and terms of a settlement agreement is a "two-edged sword" that "cuts both ways."

> For example, the mere fact of settlement by a codefendant could suggest liability on the part of a blameless non-settling defendant. The amount of the settlement, if large, might tend to suggest a higher value of a claim. If small, the jury might tend to "make it up" by a higher verdict as to the non-settling tortfeasor. See *Orr v Coleman*, 455 SW2d 59 (Ky, 1970), in which the court found jury consideration of the fact and amount of settlement prejudicial to defendant non-settling tortfeasor.
>
> On the other hand, a small settlement could disadvantage a plaintiff if the jury perceived that amount as bearing on the total value of the claim. The jury also might consider its duty to be diminished by settlement or consider the amount involved to be adequate regardless of the non-settling defendant's liability.
>
> It is true that juries are expected to consider complicated facts and instructions and that our adversary system relies upon their ability to do so before reaching their conclusions. It is also true that jurors are human and so are subject to suggestion and sometimes to confusion concerning the relative importance of a mass of factual material

and its relationship to instructions from the bench. [*Id.* at 678-679.]

Thus, even when a true *Mary Carter* agreement is present, jurisdictions permitting such agreements, but requiring disclosure of their terms, recognize that such disclosure must be thoughtfully limited to avoid prejudice. See *Carter v Tom's Truck Repair, Inc*, 857 SW2d 172, 178 (Mo, 1993). Specifically, matters such as the amount of a settlement and references to insurance are generally barred from disclosure to the jury. *Id.* Consequently, we conclude that, in cases such as this, the interest of fairness served by disclosure of the true alignment of the parties to the jury must be weighed against the countervailing interests in encouraging settlements and avoiding prejudice to the parties. However, because agreements to settle claims between parties who nevertheless remain at trial are virtually limitless in their possible variations, this balance will of necessity be struck differently depending on the facts of each case. Thus, parties must rely on the sound discretion of the trial court to ensure that, whatever the circumstances of a particular case, the integrity of the adversarial process is preserved. Indeed, the trial court has both the duty and the discretion to fashion procedures that ensure fairness to all the litigants in these situations. See *Anthony v Cochrane*, 295 Mich 386, 391; 295 NW 197 (1940); *Badalamenti v William Beaumont Hospital-Troy*, 237 Mich App 278, 293; 602 NW2d 854 (1999). Here, the trial court's failure to so weigh the interests and fashion such a procedure deprived the nonsettling defendants of a fair trial, i.e., one in which in which the true alignment of the parties is known to the trier of fact. *Dosdourian, supra,* 624 So 2d at 243. Consequently, should any similar agreements be reached between the parties on remand, the trial court

must craft a means of disclosure that reasonably en-sures fairness to each litigant.

### 2. APPORTIONMENT OF CONDUCT MORE CULPABLE THAN NEGLIGENCE UNDER MCL 257.401

Les Stanford Oldsmobile also argues that the trial court erred by refusing to instruct the jury that, as the owner of the vehicle being driven by Mohamad Bazzi at the time of the accident, the dealership was liable only for Mohamad's ordinary negligence. We disagree. This Court reviews a trial court's decision regarding jury instructions for an abuse of discretion. *Chastain v Gen Motors Corp (On Remand)*, 254 Mich App 576, 590; 657 NW2d 804 (2002).

As previously noted, Les Stanford Oldsmobile's li-ability stems from the owner's liability statute, MCL 257.401(1), which provides that "[t]he owner of a motor vehicle is liable for an injury caused by the negligent operation of the motor vehicle whether the negligence consists of a violation of a statute of this state or the ordinary care standard required by common law." In *Peyton v Delnay*, 348 Mich 238; 83 NW2d 204 (1957), our Supreme Court was called upon to interpret the liability of the owner of a motor vehicle in a suit brought under the now-repealed guest-passenger provi-sion of the owner's liability statute.[9] The defendant owner there claimed that if the driver was guilty of gross negligence or wilful and wanton misconduct, the

---

[9] The guest-passenger provision of MCL 257.401, which precluded a guest passenger in an automobile from bringing suit against an owner or operator except upon proof of gross negligence or willful and wanton misconduct by the driver, was declared unconstitutional in *Manistee Bank & Trust Co v McGowan*, 394 Mich 655, 663; 232 NW2d 636 (1975), overruled in part on other grounds by *Harvey v Michigan*, 469 Mich 1, 14 (2003), and the statute was later amended to exclude that provision. See 1988 PA 125.

owner would not be liable because, under MCL 257.401, only ordinary negligence is imputed to the owner. *Peyton*, *supra* at 246. The Court, in rejecting the owner's claim, found that "the language of the statute imposes liability on the owner where, as here, consent to and knowledge of the driving are conceded and the operator is found guilty of 'wilful and wanton misconduct.' " *Id.* at 248. The Court further noted that the owner's liability statute constitutes

> a measure adopted by the legislature to promote public safety by holding automobile owners accountable for certain negligent acts of the persons to whom they entrust their automobiles. It would be a strange construction of such a statute to hold an owner [liable] for the ordinary negligence of the person whom he allowed to drive his car and free him from liability if his chosen driver was found guilty of gross negligence or wilful and wanton misconduct. [*Id.* at 248-249 (citations omitted).]

Cf. *Berry v Kipf*, 160 Mich App 326, 329-330; 407 NW2d 648 (1987) (owner not liable for intentional acts of driver who had permission). Because the instruction requested by Les Stanford Oldsmobile was contrary to the holding in *Peyton*, the trial court did not abuse its discretion in refusing to so instruct the jury. *Chastain*, *supra* at 590.

### 3. THE WRONGFUL-CONDUCT RULE

Mohamad Bazzi also argues that the trial court erred by denying his motion for judgment notwithstanding the verdict, which motion was premised on the ground that any claim for the wrongful death of Ronny Hashem was barred under the "wrongful-conduct rule" of *Orzel v Scott Drug Co*, 449 Mich 550; 537 NW2d 208 (1995).[10]

---

[10] Because an action for wrongful death is derivative in that the representative of the deceased stands in the latter's shoes, plaintiff, as

We disagree. A trial court's decision regarding a motion for judgment notwithstanding the verdict is reviewed de novo. *Sniecinski, supra* at 131.

The wrongful-conduct rule provides that when "a plaintiff's action is based, in whole or in part, on his own illegal conduct," his claim is generally barred. *Orzel, supra* at 558. The rule rests on the public policy premise that courts should not, directly or indirectly, encourage or tolerate illegal activities. *Id.* at 559-560. As conduct providing the basis for application of the wrongful-conduct rule in furtherance of these policies, Mohamad Bazzi cites the decedent's unlawful consumption of alcohol as a minor and participation in the "drag race" between Hassan and Mohamad. See MCL 436.1703(1) and MCL 257.626a. However, that a plaintiff was engaged in illegal conduct at the time of his injury does not automatically bar his claim. Rather, to implicate the wrongful-conduct rule, the conduct must be serious in nature and prohibited under a penal or criminal statute. *Orzel, supra* at 561. Further, the wrongful-conduct rule only applies if there exists a sufficient causal nexus between the plaintiff's illegal conduct and the asserted damages. *Id.* at 564.

Initially, we note that the misdemeanor conduct alleged here is not of the type that typically invokes the application of the wrongful-conduct rule. See *id.* at 561. With respect to such conduct, the *Orzel* Court specifically noted that "where the plaintiff's illegal act only amounts to a violation of a safety statute, such as traffic and speed laws or requirements for a safe workplace, the plaintiff's act, while illegal, does not rise to the level of serious misconduct sufficient to bar a cause of action

the personal representative of the decedent's estate, has no better claim than the decedent would have had himself. See *Toth v Goree*, 65 Mich App 296, 298; 237 NW2d 297 (1975).

by application of the wrongful-conduct rule." *Id.*; see also, e.g., *Longstreth v Gensel*, 423 Mich 675; 377 NW2d 804 (1985) (wrongful-death action not barred when minor plaintiff violated the statute prohibiting driving while under the influence of alcohol); *Poch v Anderson*, 229 Mich App 40, 48-52; 580 NW2d 456 (1998) (unlawful furnishing of alcohol to minor defendant by plaintiff did not bar suit for damages). However, even were we to conclude that the conduct at issue here was sufficiently serious to warrant application of the wrongful-conduct rule, the evidence at trial failed to establish the causal connection also necessary to bar the instant suit on that ground. Although it was not disputed at trial that the decedent unlawfully purchased and consumed alcohol before his death, there was nothing in the evidence presented at trial to indicate the requisite "causal nexus" between such conduct and the asserted damages. *Orzel, supra* at 564. As explained by this Court in *Poch, supra* at 49, quoting *Manning v Bishop of Marquette*, 345 Mich 130, 136; 76 NW2d 75 (1956), and 1 Am Jur 2d, Actions, § 45, p 753:

> "For a plaintiff to be barred of an action for negligent injury . . . his injury must have been suffered while and as a proximate result of committing an illegal act. The unlawful act must be at once the source of both his criminal responsibility and his civil right. The injury must be traceable to his own breach of the law and such breach must be an integral and essential part of his case. . . ."
>
> In other words, "if a complete cause of action can be shown without the necessity of proving the plaintiff's illegal act, the plaintiff will be permitted to recover notwithstanding that the illegal act may appear incidentally and may be important to the explanation of other facts in the case."

Because plaintiff was not required to prove the decedent's violation of MCL 436.1703(1) in order to plead

his claim for wrongful death, the fact that the decedent violated the statute by purchasing and consuming alcoholic beverages did not bar the instant suit. Similarly, and contrary to Mohamad Bazzi's assertion, although there was testimony from which it could be concluded that Hassan and Mohamad were racing and that this conduct contributed to the accident in which the decedent was killed, there is no evidence to indicate that the decedent willingly participated in the high-speed driving that contributed to his death. Cf. *Robinson v Detroit*, 462 Mich 439, 452 n 10; 613 NW2d 307 (2000) ("Culpable passengers have no greater claim to benefit from . . . wrongful conduct than does the driver."). To the contrary, the testimony offered at trial indicates that the decedent was strongly opposed to the manner in which Mohamad was driving and the rate of speed, and pleaded that he slow down. Accordingly, because the evidence at trial failed to show a causal connection between the accident in which the decedent was killed and any culpable misconduct on his part, the trial court did not err by denying the motion for judgment notwithstanding the verdict on this ground.

### 4. EXPERT TESTIMONY CONCERNING PRESENT VALUE OF FUTURE DAMAGES

Les Stanford Oldsmobile also argues that it is entitled to a new trial, or remittitur, as a result of the trial court's decision to permit economist Michael Thompson to testify concerning the effect of inflation on an award of future noneconomic damages. This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *Shuler v Michigan Physicians Mut Liability Co*, 260 Mich App 492, 508; 679 NW2d 106 (2004).

With respect to future noneconomic damages, Thompson testified by way of example, using a chart to demonstrate "how to make an adjustment for inflation over time." On appeal, Les Stanford Oldsmobile asserts that the trial court erred by permitting this testimony because it invited the jury to nullify the requirement of MCL 600.6306(1)(e) that an award of future noneconomic damages be reduced to present value.[11] We disagree.

Les Stanford Oldsmobile does not dispute that the testimony at issue was relevant to the jury's task of determining the value of any award of future noneconomic damages. MRE 401. Nor does it dispute that expert testimony that assists a jury in such a task is generally admissible under MRE 702. Moreover, to the extent that Les Stanford Oldsmobile implies that MCL 600.6306 precludes the jury itself from awarding damages at present value, we note that the statute governs

---

[11] As evidence of such nullification, Les Stanford Oldsmobile points to the jury's limitation of its award of future noneconomic damages to a lump sum for a single year. However, by failing to object or otherwise ask that the trial court redirect the jurors to apportion future damages after they first returned with their verdict, Les Stanford Oldsmobile has waived any right to review of this alleged error. *Byrne v Schneider's Iron & Metal, Inc,* 190 Mich App 176, 184; 475 NW2d 854 (1991). Les Stanford Oldsmobile has also waived or otherwise forfeited review of any concomitant error arising from the closing argument of plaintiff's counsel, during which counsel requested that the jury consider Thompson's testimony when determining "the monetary damages you want the family to get now." Although counsel for Les Stanford Oldsmobile challenged the propriety of this argument during discussion of jury instructions the following day, he offered no objection at the time of the argument. Moreover, with the express acquiescence of counsel for Les Stanford Oldsmobile, a curative instruction was proposed and later relayed to the jury. By expressing satisfaction with and accepting the trial court's curative instruction, Les Stanford Oldsmobile extinguished any error arising from the allegedly improper argument. See *People v Carter,* 462 Mich 206, 218-220; 612 NW2d 144 (2000). Accordingly, we decline to address these matters further.

only the procedure for entering an order of judgment following a jury verdict. Specifically, the statutes provides, in relevant part that

[a]fter a verdict rendered by a trier of fact in favor of a plaintiff, an order of judgment shall be entered by the court. . . . [T]he order of judgment shall be entered against each defendant, including a third-party defendant, in the following order and in the following judgment amounts:

* * *

(e) All future noneconomic damages reduced to gross present cash value. [MCL 600.6306(1).]

A plain reading of this language, see *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999), makes clear that the statute does not require the trial court itself to reduce a plaintiff's future noneconomic damages to present value. Rather, the statute simply states that the order of judgment must include such damages reduced to present cash value. Accordingly, we reject Les Stanford Oldsmobile's assertion that the challenged testimony impermissibly permitted the jury to "nullify" or otherwise contravene the requirements of MCL 600.6306(1)(e). Indeed, this Court has previously held that if a jury awards damages already reduced to present value, a trial court does not err by refusing to further reduce the damages according to the requirements of MCL 600.6306. *Setterington v Pontiac Gen Hosp*, 223 Mich App 594, 607; 568 NW2d 93 (1997). Consequently, the trial court did not abuse its discretion by admitting the challenged testimony.[12]

---

[12] Because we conclude that this matter must be remanded for a new trial, we do not reach Les Stanford Oldsmobile's claim that the trial court further abused its discretion by denying its motion for remittitur premised on a comparison of the verdict awarded here to that awarded in other "comparable" cases. For this same reason, we need not address the

### 5. EVIDENCE OF MARIJUANA INGESTION

Mohamad Bazzi argues that the trial court erred by refusing to admit evidence related to the presence of marijuana-related tetrahydrocannabinol (THC) metabolites detected by a toxicology screen conducted during the autopsy of the decedent. We disagree.

Mohamad Bazzi asserts that this evidence, consisting of a toxicology report and testimony from the medical examiner and toxicologist Werner Spitz, M.D., was admissible to show that the decedent's use of marijuana rendered him "unable or unwilling to take steps to protect himself" on the night of his death and, therefore, was a cause of that death. With respect to the testimony of Dr. Spitz, Mohamad Bazzi asserts that, if permitted, Spitz would have testified "as to what 500 nanograms of marijuana would mean in Ronny Hashem's blood as to the clouding of his judgment . . . ." Mohamad Bazzi, however, made no offer of proof below regarding the substance of Spitz's testimony, as required by MRE 103(a)(2), and fails to even allude to the substance of that testimony on appeal. Consequently, appellate review of the admissibility of that testimony is precluded. *In re Green Charitable Trust*, 172 Mich App 298, 329; 431 NW2d 492 (1988). Moreover, the argument is factually flawed.[13] Although the record indicates that testing of Hassan Bazzi shortly after the accident revealed THC metabolite levels totaling 500 nanograms, contrary to Mohamad Bazzi's assertion, the medical examiner's testimony and toxicology report indicate that only 12 nanograms of the same metabolite

---

propriety of the trial court's decisions regarding the effect of the release and satisfaction of judgment executed between plaintiff and Hassan Bazzi.

[13] At oral argument, counsel for Mohamad Bazzi forthrightly acknowledged this error.

was detected in the decedent. With respect to the significance of this metabolite, the medical examiner testified that, although THC is a component of marijuana, only the metabolites of THC were detected during the toxicology screen. While acknowledging that he was not a toxicologist, the medical examiner further testified that more recent marijuana use would result in the THC compound itself being present in the blood and that, depending on the amount actually ingested, the levels detected in the decedent indicated that ingestion could have occurred anywhere from a few hours to one week before the night of the accident. Given this testimony, and considering Mohamad Bazzi's failure to properly preserve this argument below, we find no manifest injustice in the exclusion of the challenged evidence, and conclude that appellate review of this issue has been waived. See *Napier v Jacobs*, 429 Mich 222, 227-229; 414 NW2d 862 (1987). Whether such evidence should be admitted at any trial on remand is a question left to the discretion of the trial court, following a proper offer of proof establishing the relevance and probative value of the evidence, if any. See MRE 401 and 403.

We reverse and remand. We do not retain jurisdiction.