# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

---

AUTO OWNERS INSURANCE COMPANY,

        Plaintiff-Appellant,

v

OLYMPIA ENTERTAINMENT, INC,

        Defendant/Cross-Plaintiff-Appellee,
and

FRATERNAL ORDER OF POLICE
ASSOCIATES, GROSS POINTE LODGE 102,

        Defendant/Cross-Defendant-
        Appellee,
and

CHAD SEILS, as Personal Representative of the
Estates of CARRIE MARIE SEILS, Deceased, and
Estate of SKYLER SEILS, Deceased, and as Next
Friend of HEAVYN SEILS, minor,

        Defendant-Appellee.

FOR PUBLICATION
March 26, 2015
9:15 a.m.

No.  315891
Wayne Circuit Court
LC No.  12-002420-CK

---

CHAD SEILS, as Personal Representative of the
Estate of CARRIE MARIE SEILS, Deceased, and
Estate of SKYLER SEILS, Deceased, and as Next
Friend of HEAVYN SEILS, minor,

        Plaintiff-Appellee,

v

FRATERNAL ORDER OF POLICE
ASSOCIATES, GROSS POINTE LODGE 102,

        Defendant-Appellant,

No.  315901
Wayne Circuit Court
LC No.  11-010598-CZ

-1-

and

TODD MICHAEL PINK, RICHARD PINK and
OLYMPIA ENTERTAINMENT, INC.,

Defendants.

CHAD SEILS, as Personal Representative of the
Estates of CARRIE MARIE SEILS, Deceased, and
Estate of SKYLER SEILS, Deceased, and as Next
Friend of HEAVYN SEILS, minor,

Plaintiff-Appellee,

v                                                                    No.  316511
                                                                     Wayne Circuit Court
FRATERNAL ORDER OF POLICE                                            LC No.  11-010598-CZ
ASSOCIATES, GROSS POINTE LODGE 102,
TODD MICHAEL PINK and RICHARD PINK

Defendants,
and

OLYMPIA ENTERTAINMENT, INC.,

Defendant-Appellant.

Before:  BOONSTRA, P.J., and MARKEY and K. F. KELLY, JJ.

PER CURIAM.

These cases are consolidated for purposes of appeal.  In Docket No. 315891, Auto-Owners Insurance Company (Auto-Owners), appeals by right the trial court's declaratory ruling that the general liability policy it issued to the Fraternal Order of Police Associates, Grosse Pointe Lodge 102 (FOPA) provided both dramshop and contractual liability coverage for an incident where an alleged intoxicated person (AIP) murdered and severely injured several people.  In Docket No. 315901, this Court granted the FOPA's application for leave to appeal the trial court's denial of its motion for summary disposition of the underlying dramshop action.  Similarly, in Docket No. 316511, defendant Olympia Entertainment, Inc. (Olympia) appeals by leave granted the trial court's denial of its motion for summary disposition with respect to the same dramshop action.  For the reasons discussed in this opinion, we conclude that the trial court did not err in its ruling in Docket No. 315891 but that in Docket No. 315901 and Docket No. 316511 should have granted summary disposition to defendant regarding the dramshop action because plaintiff Chad Seils cannot establish proximate cause.  MCL 436.1801(2) and (3).

I. SUMMARY OF PERTINENT FACTS AND PROCEEDINGS

A. DOCKET NO. 315891

According to the testimony of Robert Estabrook, its treasurer and one of its incorporators, the FOPA is a nonprofit corporation organized for the purpose of supporting the police and various charities such as Special Olympics and other community charities. The FOPA also directly supports local police by doing things like buying GPS units for detectives' cars and bullet-proof vests for new officers. Its articles of nonprofit incorporation state that in addition to inculcating "loyalty and allegiance" to the Constitution and nation, the FOPA's purpose is to "join together fraternally . . . to promote and foster the impartial enforcement of law and order; to assist in all reasonable and ethical ways our parent lodge, Fraternal Order of Police, Grosse Pointe Lodge No.102, in their endeavor to support and assist their members and family . . . ."

To raise money for its stated purposes, the FOPA would each year obtain a temporary license from the Liquor Control Commission (LCC) to staff a beer tent at various community special events, and, in particular, to staff a beer tent at an annual three-day event known as the Detroit Hoedown. It is undisputed that this event was the FOPA's main fundraiser for twenty years preceding the events of May 2010. CBS Radio and Live Nation promoted the Detroit Hoedown, and concessions were run by a succession of event managers ending in 2010 with Olympia. For the 2010 Hoedown, Olympia and FOPA entered into a concession agreement. Twelve other civic groups also signed concession agreements as "sub-licensees" to staff beer tents at the Hoedown under the auspices of the FOPA's special liquor license. Estabrook testified that Olympia recruited, trained, and supervised the other civic groups and that the FOPA was responsible for only one beer tent. The FOPA earned $8,010.19 from the 2010 Hoedown, representing an 8% commission on gross sales from the beer tent it staffed; gross beer sales at the entire event were $875,351.70. The other civic groups likewise received an 8% commission on gross sales from the beer tent the civic group staffed.

The concession agreement required the FOPA to obtain and certify to Olympia that it had obtained "(i) comprehensive general liability insurance . . . (ii) required worker's compensation coverage; and (iii) host liquor liability insurance of not less than $500,000 for each occurrence." Also, these insurance policies were to include Olympia, CBS Radio, Live Nation, Downtown Hoedown, and the city of Detroit as additional named insured parties. The FOPA did not obtain liquor liability insurance.

The concession agreement also contained an indemnification clause providing that "[i]rrespective of the amount of insurance provided, [the FOPA] shall be liable for and shall indemnify, defend and hold harmless [Olympia] . . . against and with respect to any claim, liability, obligation, loss, damage, assessment, judgment, cost and expense . . . arising out of or as result of or related to" the FOPA's performance of the agreement.

The issues presented in this appeal concern the application of two exclusions in the commercial general liability (CGL) policy that Auto-Owners issued to the FOPA. The "Tailored Protection Policy" identifies the insured on its face page as "FOP LODGE #102" and as a "Club" that is "Not for Profit." The policy both excluded and provided coverage for liquor liability by providing under "Exclusions" that "[t]his insurance does not apply to:"

-3-

c. Liquor liability

"Bodily injury" or "property damage" for which any insured may be held liable by reason of:

(1) Causing or contributing to the intoxication of any person;

(2) The furnishing of alcoholic beverages to a person under the legal drinking age or under the influence of alcohol; or

(3) Any statute, ordinance or regulation relating to the sale, gift, distribution or use of alcoholic beverages.

This exclusion applies only *if you are in the business of* manufacturing, distributing, *selling, serving or furnishing alcoholic beverages*. [Emphasis added.]

The policy also both excluded and provided coverage for contractual liability by providing in paragraph 2(b) under "Exclusions":

b. Contractual Liability

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

(1) Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. However, if the insurance under this policy does not apply to the liability of the insured, it also does not apply to such liability assumed by the insured under an "insured contract".

The meaning of "insured contract" pertinent to this case is found in the Section V of the policy setting forth various definitions. The parties agree it means:

That part of *any other contract or agreement pertaining to your business* . . . under which you assume the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement. [Emphasis added.]

At an April 1, 2013, hearing on the parties' motions for summary disposition, the trial court ruled with respect to § 2(c) of the policy that the FOPA was not "in the business of . . . selling, serving or furnishing alcoholic beverages." Therefore, the liquor liability exclusion of the CGL policy did not apply. The trial court first noted that "business" was undefined and opined "if it's defined as purposeful activity, then the exclusion might apply. But if we look at other definitions in the business, where we talk about on – ongoing commercial activity to provide a livelihood to a person, in this case an organization, then it wouldn't apply." The court also found pertinent a distinction found in some cases of "a single activity or a single incident

-4-

versus a continuous activity," which favored the FOPA. The court then ruled that the FOPA was not "in the business of . . . selling, serving or furnishing alcoholic beverages."

The trial court rejected Auto-Owners contention that if the FOPA is not in the business of selling alcohol, and the contract between the FOPA and Olympia concerned selling alcohol, then the concession agreement could not be an "insured contract" because it did not "pertain" to the FOPA's business. The trial court ruled that the definition of "insured contract"—i.e., "pertaining to your business"—was broader than "in the business" as used in the liquor liability exclusion. On this basis, the trial court ruled that the concession agreement "pertained" to the FOPA's fund raising for its business of civic and charitable activities. Therefore, the contractual liability exclusion of Auto-Owners' CGL policy did not apply.

For these reasons, the trial court entered an order on April 17, 2013, denying Auto-Owners' motion for summary disposition and granting summary disposition to defendant-insured FOPA. This order required Auto-Owners to defend and indemnify the FOPA in the underlying dramshop action. On the basis of its ruling on the contractual liability exclusion, the trial court also ordered that Auto-Owners defend and indemnity defendant Olympia because the concession agreement between the FOPA and Olympia regarding the staffing of beer tents at the three-day Detroit Hoedown was an "insured contract."

## B. DOCKET NOS. 315901 & 316511

Plaintiff Chad Seils (plaintiff or Seils) is the ex-husband of decedent Carrie Marie Seils and the father of their children, decedent Skyler Seils and Heavyn Seils.[1] On May 15, 2010, Carrie and Skyler were killed at their home in Clinton Township by a man whom Carrie had been dating, defendant Todd Michael Pink. Pink also shot Carrie's roommate, James Pagano, and seriously injured Heavyn. Following a jury trial in April 2011, Pink was convicted of two counts of first-degree premeditated murder, two counts of felony murder, two counts of assault with intent to murder, four counts of possession of a firearm during the commission of a felony, one count of first-degree home invasion, one count of assaulting or resisting a police officer, and one count of felon in possession of a firearm. This Court affirmed Pink's convictions and sentences but remanded for the correction of the judgment of sentence.[2]

On August 31, 2011, plaintiff, as personal representative of the estate of Carrie and Skyler Seils and as next friend of Heavyn, sued the FOPA, Olympia, Todd Pink and his father, Richard Pink.[3] In relevant part, the first amended complaint alleges that on the evening of Friday, May 14, 2010, and throughout the day on Saturday, May 15, 2010, Todd Pink and Carrie Seils "were engaged in a joint alcohol drinking binge," and that by mid-afternoon, Pink was visibly intoxicated. In the afternoon, Pagano, Pink and Carrie decided to attend the Hoedown

---

[1] At the time, Skyler was three, and Heavyn was five years old.

[2] *People v Pink*, unpublished opinion per curiam of the Court of Appeals, issued August 28, 2012 (Docket No. 304909).

[3] The register of actions indicates that the trial court dismissed Richard Pink on June 28, 2013.

Festival at Hart Plaza. Pagano drove and Carrie's children went along with the three adults. Plaintiff alleges that Todd Pink purchased and consumed "several beers" from the beer vendors shortly after arriving at the festival, that Pink's behavior became increasing disruptive and aggressive from his increasing intoxication, and that he precipitated several "near violent confrontations" with festival attendees. Pagano and Carrie Seils decided they should leave the festival to "avoid a brawl from erupting" and insisted that Pink accompany them "before he got himself arrested." During the drive home, Todd Pink and Carrie Seils engaged in an argument about leaving the festival. Upon arriving at the residence in Clinton Township, Pink drove off in his car and went to the mobile home where his father lived and retrieved a loaded handgun. Upon returning to the Clinton Township resident, Pink kicked in the door, shot Pagano in the head, and then fatally shot Carrie Seils. Pink aimed the gun at Heavyn, but the gun jammed and did not discharge. Pink then chased the children into the kitchen, grabbed a large knife and fork, and stabbed the children multiple times.

In relevant part, the amended complaint alleges that the FOPA was granted a special license by the LCC to serve intoxicating beverages at the festival, that the FOPA sold alcoholic beverage to Todd Pink, whom the FOPA knew or should have known was visibly intoxicated in violation of MCL 436.22,[4] and that the furnishing of alcoholic beverage "caused and/or contributed to the horrific violent crimes" Pink committed while he was severely intoxicated.

In Docket No. 315901, the FOPA appeals by leave granted the trial court's separate April 17, 2013, order denying its motion for summary disposition of plaintiff's dramshop action on the basis that the actions of Richard Pink in committing first-degree premeditated murder and assault with intent to murder were not reasonably foreseeable such that plaintiff Seils could not establish the necessary element of proximate causation. The FOPA argued that under the undisputed facts that Pink's actions were deliberate and premeditated and thus not a foreseeable consequence of serving alcohol to a visibly intoxicated adult, and that Pink's specific intent severed any causal chain with respect to any improper serving of alcohol. Olympia filed a concurrence in this aspect of the FOPA's motion. The trial court ultimately denied the motions relying on *Weiss v Hodge (After Remand)*, 223 Mich App 620; 567 NW2d 468 (1997) (holding that the dramshop act permits imposition of liability for intentional torts), and found that the issue of proximate cause was a question of fact.

In Docket No. 316511, Olympia appeals by leave granted the trial court's May 14, 2013, order denying its motion for summary disposition with respect to plaintiff's dramshop action. The parties also argued this motion on April 1, 2013. In addition to ruling that the issue of proximate cause presented a question of fact for trial, the trial court rejected Olympia's arguments that it could not be held liable under the dramshop act because it was not the liquor licensee and because plaintiff failed to provide it with written notice as required by MCL 436.1801(4).

## II. DOCKET NO. 315891

---

[4] MCL 436.22 is the predecessor to the current applicable statute, MCL 436.1801, which has been in effect since 1998.

## A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *DeFrain v State Farm Mutual Automobile Ins Co*, 491 Mich 359, 366; 817 NW2d 504 (2012). Summary disposition is proper if the evidence, affidavits, pleadings, and admissions viewed in a light most favorable to the other party demonstrate that there is no genuine issue of any material fact and a party is entitled to judgment as a matter of law. *Hastings Mut Ins Co v Safety King, Inc*, 286 Mich App 287, 291; 778 NW2d 275 (2009); MCR 2.116(C)(10). The trial court's decision regarding declaratory relief is reviewed for an abuse of discretion. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 376; 836 NW2d 257 (2013).

We also review de novo the interpretation of a contract and the legal effect of one of its clauses. *Rory v Continental Ins Co*, 473 Mich 457, 461, 464; 703 NW2d 23 (2005). We construe insurance contracts in the same manner as other contracts, assigning the words in the contract their "plain and ordinary meaning that would be apparent to a reader of the instrument." *DeFrain*, 491 Mich at 366-367 (citations omitted). A dictionary may be consulted to ascertain the plain and ordinary meaning of words or phrases used in the contract. *Citizens Ins Co v Pro-Seal Serv Group, Inc*, 477 Mich 75, 84; 730 NW2d 682 (2007). A "court must look at the contract as a whole and give meaning to all terms." *Auto-Owners Ins Co v Churchman*, 440 Mich 560, 566; 489 NW2d 431 (1992). After ascertaining the meaning of a contract's terms, "a court must construe and apply unambiguous contract provisions as written." *Rory*, 473 Mich at 461. A contract is ambiguous when, after considering the entire contract, its words may reasonably be understood in different ways. *Farm Bureau Mutual Insurance Co v Nikkel*, 460 Mich 558, 566-568; 596 NW2d 915 (1999). Thus, where "a fair reading of the entire contract of insurance leads one to understand that there is coverage under particular circumstances and another fair reading of it leads one to understand there is no coverage under the same circumstances the contract is ambiguous[.]" *Raska v Farm Bureau Mut Ins Co of Mich*, 412 Mich 355, 362; 314 NW2d 440 (1982). An ambiguous provision in an insurance contract is construed against the insurer and in favor of coverage. *Id.*; *Heniser v Frankenmuth Mut Ins Co*, 449 Mich 155, 160; 534 NW2d 502 (1995).

A two-step analysis is used when interpreting an insurance policy: first, does the general insurance policy provide coverage for the occurrence, and second, if coverage exists, does an exclusion negate the coverage. *Hunt v Drielick*, 496 Mich 366, 373; 852 NW2d 562 (2014). "It is the insured's burden to establish that his claim falls within the terms of the policy." *Heniser*, 449 Mich at 172. In this case, the parties do not seriously dispute that if the exclusions at issue do not apply, plaintiff's claims come within the general terms of the commercial liability policy that Auto-Owners issued to FOPA and also that the general terms of the policy cover the contractual liability of FOPA to Olympia under the concession agreement. The insurance company has the burden to prove that one of the policy's exclusions applies. *Id.* at 161 n 6; *Dells*, 301 Mich App at 378. "Exclusionary clauses in insurance policies are strictly construed in favor of the insured." *Churchman*, 440 Mich at 567. But clear and specific exclusions will be enforced as written so that the insurance company is not held liable for a risk it did not assume. *Id.*; *Group Ins Co of Mich v Czopek*, 440 Mich 590, 597; 489 NW2d 444 (1992).

## B. ANALYSIS

Auto-Owners argues that the trial court erred by finding the insurance policy's liquor liability exclusion did not apply on the facts of this case because the FOPA was "in the business of . . . selling, serving, or furnishing alcoholic beverages." Furthermore, Auto-Owners contends that if the FOPA was not in the business of selling alcoholic beverages, for purposes of avoiding the liquor liability exclusion, then the concession agreement cannot pertain to the FOPA's business because it was totally about the sale of alcohol, and, therefore, coverage for Olympia is excluded. We conclude that because the policy in this case did not exclude *all* coverage for liquor liability and contractual liability and because under the facts and circumstances of this case the exceptions to the exclusions arguably apply, the trial court did not err in strictly construing the exclusions at issue in favor of coverage. *Churchman*, 440 Mich at 567. Moreover, in light of foreign case law interpreting the liquor liability exclusion at issue,[5] a fair reading of the policy as a whole could lead to opposite conclusions regarding coverage; therefore, the policy "should be construed against its drafter and in favor of coverage." *Raska*, 412 Mich at 362.

The Auto-Owners policy does not define the keyword "business" or the critical phrases "in the business of" and "pertaining to your business." Consequently, when determining the plain and ordinary meaning of these words and phrases it is appropriate be consult a dictionary. *Safety King*, 286 Mich App at 294. Further, contractual terms must be construed in context, *Vushaj v Farm Bureau Gen Ins Co*, 284 Mich App 513, 516; 773 NW2d 758 (2009), and read in light of the contract as a whole, *Churchman*, 440 Mich at 566.

In *Random House Webster's College Dictionary* (1992), "business" is defined as:

1. an occupation, profession, or trade. 2. the purchase and sale of goods in an attempt to make a profit. 3. a person, partnership, or corporation engaged in commerce, manufacturing, or a service. 4. volume of trade; patronage or custom. 5. a store, office, factory, etc., where commerce is carried on. 6. that with which a person is principally and seriously concerned: *Words are writers business. . . .*

The *American Heritage Dictionary, Second College Edition* (1985), similarly defines the word "business" as: "1. a. The occupation, work or trade in which a person is engaged: *in the wholesale food business.* b. A specific occupation or pursuit: *really knew her business.* 2. Commercial, industrial, or professional dealings: *new systems now being used in business.* 3. A commercial enterprise or establishment: *bought his uncle's business. . . .*" And, *Black's Law Dictionary* (10th ed), defines "business" as "1. A commercial enterprise carried on for profit; a particular occupation or employment habitually engaged in for livelihood or gain. . . . 2. Commercial enterprises <business and academia often have congruent aims>. 3. Commercial transactions <the company has never done business in Louisiana>. . . ."

---

[5] Cases from other jurisdictions are not binding precedent, but we may consider them to the extent this Court finds persuasive their legal reasoning. *Hiner v Mojica*, 271 Mich App 604, 612; 722 NW2d 914 (2006).

While these dictionary definitions support Auto-Owners' argument that "business" could mean any "occupation, profession, or trade," nothing in the wording of the exception to the liquor liability exclusion or the rest of the policy supports its argument that the exception is intended to apply only to furnishing alcoholic beverages in a social-host setting. Also, contrary to Auto-Owners' argument that the focus of the exception is on the activity of the insured at the time of the occurrence, the wording of the exception, "if *you* are in the business of . . . selling, serving or furnishing alcoholic beverages," places emphasis on the defining aspect of the insured.[6] Auto-Owners could have, but did not, place the focus of the liquor liability exclusion on the nature of the activity giving rise to the claim, as did the policies at issue in some of the out-of-state cases the parties cite, such as *McGriff v United States Fire Ins Co*, 436 NW2d 859, 861, 862 (SD, 1989), and *Fraternal Order of Eagles v Gen Accident Ins Co*, 58 Wash App 243, 246; 792 P2d 178 (1990). In each of these cases, the liquor liability exclusion applied when the insured "organization *engaged in the business of* . . . selling or serving alcoholic beverages . . . ." *Id*. (emphasis added). Thus, the exclusion focused on "the *specific conduct* for which liability is alleged, not on the general nature of the organization." *Fraternal Order of Eagles*, 58 Wash App at 250 (emphasis in original). In each case the court held that the exclusion applied where the Eagles organization operated a bar on an ongoing basis for a profit which provided benefits to its members and supported its operations. *Id*. at 244, 248-249; *McGriff*, 436 NW2d at 862-863.

But even in cases in which the liquor liability exclusion applied when an "organization engaged in the business of . . . selling or serving alcoholic beverages," courts have read the word "business" as limiting its application. One court noted that if the insurance company had "clearly intended to exclude coverage for any activity involving the sale or serving of liquor, clear language to that effect could have been employed, and any reference to 'business' would have been unnecessary." *Schenectady Co v Travelers Ins Co*, 48 AD2d 299, 302; 368 NYS2d 894 (1975). Hence, the word "business" limited the application of the exclusion. *Id*. The court determined that the exclusion would apply to regular activity for pecuniary gain, i.e., an ongoing venture of selling or serving alcoholic, but that it would not apply when the sale of alcohol occurs infrequently, and the risk of dramshop liability would be limited. *Id*. at 301-302. This reading of the exclusion is consistent with dictionary definitions and with the wording of the exception to the liquor liability exclusion at issue in this case.

Other courts interpreting the exact language at issue in this case have similarly found pertinent whether the nonprofit group engaged in alcohol sales on a continuous, ongoing basis. So, where a group regularly operates a bar selling alcohol to members and the public, courts have held the exception to a liquor liability exclusion did not apply because the insured was "in the business of . . . selling, serving or furnishing alcoholic beverages." In *Auto-Owners Ins Co v Sugar Creek Memorial Post 3976, Veterans of Foreign Wars*, 123 SW3d 183, 189 (Mo App, 2003), citing dictionary definitions and quoting *Sprangers v Greatway Ins Co*, 182 Wis 2d 521,

---

[6] Cf. *Cormier v The Travelers Ins Co*, 618 So 2d 1185, 1187 (La App, 1993), opining on an exception to a liquor liability exclusion identically worded to that in the present case: "The obvious purpose of the phrase 'in the business of' is to describe the nature of the activity engaged in and has nothing to do with the specific purpose for which the activity is pursued or the nature of the person or entity engaged in the activity."

540, 514 NW2d 1 (1994), the court opined that the relevant inquiry was the nature of the insured's activities and "a court must determine whether the insured consistently engages in an activity which creates a level of risk which the insurer has declared unacceptable." The Missouri court concluded that the VFW post which operated a bar open to the public "exposed its insurer to the same risks inherent in other drinking establishments operated by for-profit entities." *Id*. Similar cases finding a liquor liability exclusion, with an exception worded exactly as in the present case, applied on the basis of regular alcohol sales include, *Nichols v Westfield Ins, Co*, 235 Ga App 239, 241-242; 509 SE2d 149 (1998) (holding the exclusion applied where a veterans group operated a bar that regularly sold alcohol to the public, which was a primary source of the group's income), and *United States Fidelity & Guaranty Co v Country Club of Johnston Co, Inc*, 119 NC App 365, 372; 458 SE2d 734 (1995) (holding that the country club was "in the business of . . . selling, serving or furnishing alcoholic beverages" where it did so on "an ongoing operation rather than an occasional or infrequent event"). In general, these cases focused on the nature of the risk created by ongoing alcohol sales rather than the corporate nonprofit character of the organization. See *Nichols*, 235 Ga App at 241 (the focus is on "the nature of risks resulting from the insured's *activities*, not from its fraternal *purposes*"), *Johnston Co Country Club*, 119 NC App at 372 ("it is irrelevant whether the insured is a nonprofit organization" where the sale of alcoholic beverages is "a permanent, ongoing operation").

A case from another jurisdiction with facts most similar to the facts of the instant case, and that construes the same policy language, is *Mutual Service Cas Ins Co v Wilson Twp*, 603 NW2d 151 (Minn App, 1999). In that case, the township and its fire department annually held a one-day fundraiser at which beer was sold under a temporary license. *Id*. at 152. A patron at the event became obviously intoxicated and later was in an automobile accident. At issue was whether the township's general liability policy, with a liquor liability exclusion identically worded to that in the instant case, provided coverage for the dramshop action filed by the injured party. *Id*. at 152-153. On the basis of dictionary definitions, the court found the phrase "in the business of" to be "commonly understood to refer to a commercial enterprise or activity." *Id*. at 153-154. The court held that the exclusion did not to apply to the township's commercial general liability policy because "the insured was a nonprofit organization that did not sell alcoholic beverages as part of a permanent and ongoing commercial venture . . . ." *Id*. at 155.

Because the policy of insurance in this case was sold to a nonprofit group whose primary purpose and activities were charitable and civic but which also engaged in limited annual fund-raising through alcohol sales permitted under a temporary license, we conclude that the trial court did not err by ruling that the FOPA was not "in the business of manufacturing, distributing, selling, serving or furnishing alcoholic beverages." Consequently, the trial court did not abuse its discretion by ruling that the exception to the liquor liability exclusion applied and that the policy provided coverage for Seils' dramshop action. Our conclusion is buttressed by the principle that insurance policy exclusions must be strictly construed against the insurer and in favor of coverage. *Hunt*, 496 Mich at 373; *Czopek*, 440 Mich at 597. Finally, even if a fair reading of the policy as a whole and applied to the facts and circumstances of this case could lead to opposite and reasonable conclusions regarding coverage, such a tie goes against the insurer and in favor of the insured. *Raska*, 412 Mich at 362.

We also conclude that the trial court properly rejected Auto-Owners' argument that the term "business" must be construed consistently throughout the contract. Rather, the word

"business" must be construed in context and read in light of the contract as a whole. *Churchman*, 440 Mich at 566; *Vushaj*, 284 Mich App at 515-516. A clearly different context surrounds the term "business" in the contractual liability exception—the definition of "insured contract"—than in the exception to the liquor liability exclusion. An "insured contract," by policy definition, is one "pertaining to your [the FOPA's] business." The word "pertain" broadly means "to have reference; relate." *Random House Webster's College Dictionary* (1992).

Thus, the trial court correctly ruled that the FOPA was not "in the business of" selling alcoholic beverages as stated in the exception to the liquor liability exclusion. But at the same time, the concession agreement "pertained" or related to the FOPA's business because it related to the FOPA's fundraising activities for its "business" of civic and charitable activities. So, in this context, the word "business" can fairly be read as "occupation, profession, or trade," *Random House Webster's College Dictionary* (1992), or "specific occupation or pursuit," *American Heritage Dictionary, Second College Edition* (1985). Fundraising was necessary for the FOPA's "business" or "pursuit" of charitable and civic activities, and the concession agreement clearly related to or pertained to the FOPA's "business" or "pursuit" of charitable and civic activities. Thus, the trial court correctly ruled that the exception to the contractual liability provision applied because the concession agreement "pertain[ed] to [the FOPA's] business."

Moreover, as with the liquor liability exclusion, the contractual liability exclusion must be strictly construed against the insurer and in favor of coverage. *Churchman*, 440 Mich at 567; *Czopek*, 440 Mich at 597. We therefore affirm the trial court's declaratory ruling regarding insurance coverage: both the liquor liability exclusion and the contractual liability exclusion do not apply on the facts of this case.

## III. DOCKET NOS. 315901 & 316511: PROXIMATE CAUSE

### A. STANDARD OF REVIEW

This Court reviews de novo a trial court's decision on a motion for summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). Under MCR 2.116(C)(10), the moving party must specifically identify the issues for which no factual dispute exists and must support this claim with evidence such as affidavits, depositions, admissions, or other documents. MCR 2.116(G)(4); *Coblentz v Novi*, 475 Mich 558, 569; 719 NW2d 73 (2006). If the moving party meets its initial burden, the opposing party then has the burden of showing with evidentiary materials the substance of which would be admissible that a genuine issue of disputed material fact exists. MCR 2.116(G)(4); MCR 2.116(G)(6). "The adverse party may not rest upon mere allegations or denials of a pleading, but must, by affidavits or other appropriate means, set forth specific facts to show that there is a genuine issue for trial." *Patterson v Kleiman*, 447 Mich 429, 432; 526 NW2d 879 (1994).

The trial court in deciding the motion must view the substantively admissible evidence submitted up to the time of the motion in a light most favorable to the party opposing the motion. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). The trial court must consider the pleadings, affidavits, depositions, admissions, or any other documentary evidence submitted in a light most favorable to the nonmoving party to decide whether a genuine issue of material fact exists. *Id.*; MCR 2.116(G)(5). Summary disposition may be granted if there is no genuine

-11-

issue of any material fact and the moving party is entitled to judgment as a matter of law. *West*, 469 Mich at 183. A genuine issue of material fact exists if the record, viewed in a light most favorable to the nonmoving party, leaves open a matter on which reasonable minds could differ. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

## B. ANALYSIS

For plaintiff to establish his dramshop action he must show that the FOPA violated MCL 436.1801(2) by selling, furnishing, or giving alcohol to Todd Pink while he was visibly intoxicated and that this statutory violation was "a proximate cause of [plaintiff's] damage, injury, or death," MCL 436.1801(3). Because plaintiff points to no evidence from which the FOPA could have reasonably foreseen Pink's intentional criminal acts and because Pink's decision to commit premeditated, deliberate murder (and other assaults) was an intervening or superseding cause of plaintiff's damages, the trial court erred by not granting summary disposition to defendants on the basis that no reasonable jury could find that the FOPA's alleged statutory violation was a proximate cause of plaintiff's injury. See *Nichols v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002) ("Generally, proximate cause is a factual issue to be decided by the trier of fact. But if reasonable minds could not differ regarding the proximate cause of the plaintiff's injury, the court should decide the issue as a matter of law.").

MCL 436.1801(3) "imposes liability on any licensee that, by the unlawful sale or furnishing of alcoholic liquor to a minor or visibly intoxicated person, has 'caused or contributed' to the intoxication that is a proximate cause of damage, injury, or death." *Hashem v Les Stanford Oldsmobile, Inc*, 266 Mich App 61, 74; 697 NW2d 558 (2005). Although a dramshop action may be premised on an AIP's assaultive criminal conduct, *Weiss*, 223 Mich App at 628-631, there still must be "sufficient evidence that furnishing the alcohol to the AIP is a proximate cause of the violent behavior." *Id*. at 630.

In *Weiss*, this Court addressed the issue of whether a liquor licensee may be held liable in tort for an AIP's intentional physical attack upon another patron, which occurred in the parking lot of the bar where the AIP had been served alcohol until 2:00 a.m. The jury found that the defendant's bartender furnished alcoholic liquor to the AIP while he was visibly intoxicated and that the furnishing of liquor to the AIP was a proximate cause of the plaintiff's injuries. On appeal, the defendant bar owner argued that while the statute contemplated liability for negligent torts, it did not create liability for intentional torts. *Id*. at 623-625. This Court analyzed the predecessor to MCL 436.1801, MCL 436.22, and noted that the statute required the sale of alcohol to be a proximate cause of the resulting injury, but did "not limit liability only to negligently inflicted injuries." *Id*. at 625-626. The *Weiss* Court further discussed prior cases that supported this interpretation of MCL 436.22(4). *Id*. at 628-633. The Court rejected the defendant's argument, holding that there was "clear precedent for predicating dramshop liability upon assaultive conduct of an AIP where there is sufficient evidence that furnishing the alcohol to the AIP is a proximate cause of the violent behavior." *Id*. at 630.

Proximate cause is "that which in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, without which such injury would not have occurred . . . ." *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985) (citation omitted). Proof of proximate cause requires establishing two elements: (1) cause in fact and (2) legal cause or

proximate cause. *Skinner v Square D Co,* 445 Mich 153, 163; 516 NW2d 475 (1994). "Cause in fact requires that the harmful result would not have come about but for the defendant's . . . conduct." *Haliw v City of Sterling Heights*, 464 Mich 297, 310; 627 NW2d 581 (2001). "A plaintiff must adequately establish cause in fact in order for legal cause or 'proximate cause' to become a relevant issue." *Skinner*, 445 Mich at 163. Whether proximate cause or legal cause is established normally requires examining the foreseeability of the consequences and whether the defendant should be held legally responsible for such consequences. *Haliw*, 464 Mich at 310; *Skinner*, 445 Mich at 163; *Nichols*, 253 Mich App at 532.

As noted in the *McMillian* definition of proximate cause, the chain of causation between the defendant's conduct and the plaintiff's injuries may be broken by an intervening or a superseding cause. An "intervening cause" is "'one which actively operates in producing harm to another after the actor's negligent act or omission has been committed.'" *McMillian*, 422 Mich at 576 (citation omitted). "An intervening cause breaks the chain of causation and constitutes a superseding cause which relieves the original actor of liability, unless it is found that the intervening act was 'reasonably foreseeable.'" *Id*. Thus, the issue of proximate causation requires focusing on "whether the result of conduct that created a risk of harm and any intervening causes were foreseeable. *Jones v Detroit Med Center*, 490 Mich 960; 806 NW2d 304 (2011).

The FOPA argues, citing *Graves v Warner Bros*, 253 Mich App 486, 493; 656 NW2d 195 (2002), that Pink's premeditated actions of killing and injuring the victims were by their nature unforeseeable. *Graves* concerned the infamous "Jenny Jones" case, where Jonathan Schmitz was invited to appear on a talk show, and the victim, Scott Amedure, confessed his crush on Schmitz; three days after the taping of the show, Schmitz murdered Amedure. Amedure's estate then brought a civil action against the producers of the talk show. This Court held that the "defendants owed no legally cognizable duty to protect plaintiffs' decedent from the homicidal acts of a third party." *Id*. at 488. The Court analyzed whether a duty of care existed under standards discussed in *MacDonald v PKT, Inc*, 464 Mich 322; 628 NW2d 33 (2001), which addresses a merchant's duty to protect business invitees from the criminal acts of third parties. This Court held that invitors have "a duty to respond reasonably to situations occurring on their premises that pose a risk of imminent and foreseeable harm to identifiable invitees," but "no duty to otherwise anticipate and prevent the criminal acts of third parties." *Graves*, 253 Mich App at 495. In concluding that the show's producers did not owe Amedure a duty of care, the *Graves* Court determined that there was no evidence putting the defendants on notice that Schmitz posed a risk of violence to others. *Id*. at 499.

*Graves* is relevant to the instant case because both the question of duty and proximate cause "'depend in part on foreseeability.'" *Babula v Robertson*, 212 Mich App 45, 54; 536 NW2d 834 (1995), quoting *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977). "In fact, the question of proximate cause has been characterized as 'a policy question often indistinguishable from the duty question.'" *Id*., quoting *Moning* 400 Mich at 439.

*Babula*, in which the defendant's husband, Brian, molested the child of the defendant's sister while the defendant was babysitting the child, is also instructive. *Babula*, 212 Mich App at 46-47. Brian was convicted of second-degree criminal sexual conduct. Later, the plaintiff brought a civil suit against Brian and added a count of negligence against the defendant. *Id*. at

47. The trial court granted the defendant's motion for summary disposition on the bases that the defendant "owed no duty to the child and that alleged negligence attributable to [the defendant] was not the proximate cause of the child's injury." *Id*. at 48. This Court determined that the injuries Brian inflicted "were wholly unforeseeable." *Id*. at 51. Relevant to the instant case was this Court's comment that "[t]he mere fact that Brian was allegedly intoxicated when [the defendant] went to sleep was not sufficient to put her on notice that Brian might injure the child." *Id*. at 53. So, while the issue of proximate cause is ordinarily a question for the trier of fact, the Court determined "that reasonable minds could not differ with regard to whether alleged negligence attributable to [the defendant] was a proximate cause of the child's injury." *Id*. at 54. The Court further held "that Brian's act of molesting the child was an unforeseeable intervening cause of the child's injury[,]" and affirmed the trial court's grant of summary disposition to the defendant. *Id*.

On the other hand, Michigan has "long recognized that criminal acts by third parties can be foreseeable." *Dawe v Dr Reuven Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 394, n 25; 808 NW2d 240 (2010). The *Dawe* case was a malpractice action arising out of injuries the plaintiff received in a murderous rampage perpetrated by a former patient (Brooks) at the defendants' psychiatric office where the plaintiff was being treated. Among the theories the plaintiff asserted was that the defendant violated a "mental-health professional's common-law duty to warn or protect third parties from dangerous patients." *Id*. at 387. An issue on appeal was proximate cause and whether Brooks' criminal actions were reasonably foreseeable. The Court concluded that because plaintiff presented evidence from which a reasonable jury could find that "defendants knew or should have known that Brooks would form improper emotional attachments to persons in his group therapy and that he might seek out those persons long after the termination of his participation in the group[,]" the issue of proximate cause was properly left for the jury to determine. *Id*. at 394-395.

Plaintiff Seils points to no evidence that would have put the FOPA, Olympia, or anyone else at the Detroit Hoedown on notice that Pink would later premeditate and deliberately commit the horrific crimes at issue in this case. Plaintiff instead speaks only of generalities, that it is well known that drinking alcohol can lead to violent behavior. In particular, plaintiff cites dicta[7] from *Terpening v Gillimino, Inc*, unpublished opinion per curiam of the Court of Appeals, issued January 12, 2001 (Docket No. 221275): "It is foreseeable that furnishing alcohol to an already drunk individual will prompt that individual to display raucous and even violent behavior causing injury to himself and others." *Id*. at 2-3. While an unpublished opinion of this Court is not precedentially binding under the principle of stare decisis, MCR 7.215(C)(1), it is ironic that the *Terpening* Court determined that the plaintiff in that case had not established proximate cause when "[i]t is not foreseeable that selling a minor a beer would result in plaintiff, a third party, being beaten up at his home later that evening." *Terpening*, unpub op at 2. At any rate, the *Terpening* Court in its dictum was referring to *Weiss*, a dramshop case where a drunken brawl

---

[7] "Obiter dicta are not binding precedent. Instead, they are statements that are unnecessary to determine the case at hand and, thus, 'lack the force of an adjudication.' " *People v Peltola*, 489 Mich 174, 90 n 32; 803 NW2d 140 (2011) (citation omitted).

occurred outside a bar after closing. While an intoxication-fueled assault occurring at or near the dramshop, as in *Weiss*, or an auto accident caused by a drunken driver, might be reasonably foreseeable results of "selling, giving, or furnishing of alcoholic liquor to [a] minor or visibly intoxicated person," MCL 436.1801(3), no evidence exists in this case that would have put defendants on notice that violating the statute would lead Pink to deliberately, and with premeditation, commit the crimes at issue here. See, e.g., *Rogalski v Tavernier*, 208 Mich App 302, 306-307; 527 NW2d 73 (1995) (holding in the context of social host liability that reasonable minds could not disagree that the criminal acts of the minors were not foreseeable consequences of serving alcohol to underage drinkers). Consequently, we conclude the alleged statutory violation in this case cannot be established as a proximate cause of plaintiff's damages. MCL 436.1801(3); *Graves*, 253 Mich App at 499-500; *Babula*, 212 Mich App at 53-54.

Our conclusion that plaintiff has failed to present evidence to establish proximate cause is supported by case law from other states that defendants cite regarding whether a dramshop violation could be a proximate cause of the subsequent violent criminal act of an intoxicated person. See *Fast Eddie's v Hall*, 688 NE2d 1270 (Ind App, 1997) (dramshop violation was not the proximate cause of drunken bar patron's rape and murder by other drunken bar patron because the series of events leading to the crimes were not reasonably foreseeable and the AIP's intentional criminal acts were an intervening cause); *Merchants Nat'l Bank v Simrell's Sports Bar & Grill, Inc*, 741 NE2d 383 (Ind App, 2000) (proximate cause not established where one bar patron shot and killed another bar patron after leaving the bar; the "intervening criminal act that broke the causal chain"); *Boggs v Bottomless Pit Cooking Team*, 25 SW3d 818 (Tex App, 2000) (dramshop violation was not a proximate cause of death when after a minor traffic accident the AIP passenger in one car stabbed and killed the driver of other car; the AIP's criminal actions were not foreseeable); *Reilly v Tiergarten, Inc*, 430 Pa Super 10; 633 A2d 675 (1993) (holding improperly serving teen who attacked his father and whom police shot was not a foreseeable or the natural and probable result of dramshop violation); and *Skipper v United States,* 1 F3d 349, 353 (CA 5, 1993) (holding under Texas law that first-degree murder committed by an AIP was an unforeseeable, superseding cause extinguishing dramshop liability).

## IV. OTHER ISSUES IN DOCKET NO. 316511

Although Olympia's remaining issues could be considered moot[8] based on our resolution of the proximate cause issue, we briefly discuss them as an alternative basis for resolving Olympia's appeal. We conclude that both of Olympia's other arguments have merit and would alternatively warrant granting summary disposition to it on plaintiff's dramshop claim.

### A. DRAMSHOP VICARIOUS LIABILITY

Olympia argues that the dramshop act is a remedial statute requiring that it be strictly construed. The act imposes duties on a "retail licensee" who is the "person" subject to liability

---

[8] An issue is moot when a judgment if entered cannot have any practical legal effect on the existing controversy. *People v Richmond*, 486 Mich 29, 34-35; 782 NW2d 187 (2010), amended 486 Mich 1041 (2010).

under the act. MCL 436.1801(2), (3); *Guitar v Biekiek*, 402 Mich 152, 166; 262 NW2d 9 (1978). Olympia further argues that the Legislature did not intend "to expand the class of persons who may be vicariously liable" beyond "the narrow and restrictively drawn civil liability provisions" of the act. *Id*. at 166-167. Further, because there is no express provision for vicarious liability under the statute, it imposes liability only on the liquor licensee. We agree. This issue presents a question of statutory interpretation, which is reviewed de novo. *Niles Twp v Berrien County Bd of Comm'rs*, 261 Mich App 308, 312; 683 NW2d 148 (2004).

In rejecting Olympia's argument on this issue, the trial court relied on *Kerry v Turnage*, 154 Mich App 275; 397 NW2d 543 (1986). *Kerry* is distinguishable and not binding precedent. MCR7.215(J)(1). Moreover, *Kerry* was overruled *sub silentio* by *McGuire v Sanders*, 268 Mich App 719; 708 NW2d 469 (2005), rev'd 474 Mich 1098; 711 NW2d 77 (2006). In *McGuire*, our Supreme Court reversed this Court's holding that one licensee (Hamilton) could be found liable under the dramshop act for exerting control over the selling licensee (Leggs Lounge) "through shared managers or employees." *Id*. at 729. Moreover, even it were good law, *Kerry* was decided on the basis that the licensee in that case, the athletic boosters, was an alter ego of the school district. In this case, the FOPA and Olympia are separate and distinct legal entities.

The dramshop act does not permit imposition of liability on a third party under a common-law theory of vicarious liability that the third party is the principal and the liquor licensee the agent. Under the dramshop act the only vicarious liability that exists is for liability flowing upward to the "retail licensee" from its "clerk, agent, or servant" that actually sells, furnishes, or gives "alcoholic liquor to a person who is visibly intoxicated." MCL 436.1801(2). Nothing may be read into a clear statute that is not within the manifest intent of the Legislature as derived from the language of the statute itself. See *People v Breidenbach*, 489 Mich 1, 10; 798 NW2d 738 (2011).

Moreover, statutes in derogation of the common law are narrowly construed. *Rusinek v Schultz, Snyder & Steele Lumber Co*, 411 Mich 502, 507-508; 309 NW2d 163 (1981). "The general rule at common law was that a tavern owner was not liable for furnishing alcoholic beverages to a customer who became intoxicated and who, as a result of his own intoxication, either injured himself or an innocent third person." *Jackson v PKM Corp*, 430 Mich 262, 266; 422 NW2d 657 (1988). The *Jackson* Court opined that the Legislature intended the dramshop act to be "'a complete and self-contained solution to a problem not adequately addressed at common law and the exclusive remedy for any action arising under 'dramshop related facts.'" *Id*. at 274-275, quoting *Millross v Plum Hollow Golf Club*, 429 Mich 178, 183; 413 NW2d 17 (1987). Further, the dramshop act provides that it is "the exclusive remedy for money damages against a licensee arising out of the selling, giving, or furnishing of alcoholic liquor to a minor or intoxicated person." MCL 436.1801(10). In sum, the dramshop act is in derogation of the common law, provides the exclusive remedy against a "retail licensee" regarding selling, furnishing, or giving alcoholic beverages to a minor or visibly intoxicated person and may not be expanded beyond its plain terms by common-law legal theories to reach non-licensees.

Consequently, we conclude that because Olympia was not the liquor licensee in this case, this argument provides an alternative basis for reversing the trial court and remanding for entry of an order granting summary disposition to Olympia regarding plaintiff's dramshop claim.

## B. STATUTORY NOTICE

As a second alternative basis for reversing the trial court, Olympia argues that plaintiff failed to give Olympia timely written notice of its intent to seek damages under the dramshop act as required by MCL 436.1801(4). We agree. This issue also presents a question of statutory interpretation, which is reviewed de novo. *Niles Twp*, 261 Mich App at 312.

> An action under this section shall be instituted within 2 years after the injury or death. A plaintiff seeking damages under this section *shall give written notice to **all defendants** within 120 days after entering an attorney-client relationship for the purpose of pursuing a claim under this section.* Failure to give written notice within the time specified *shall be grounds for dismissal of a claim as to **any defendants*** that did not receive that notice unless sufficient information for determining that a retail licensee might be liable under this section was not known and could not reasonably have been known within the 120 days. . . . [MCL 436.1801(4); Emphasis added.]

The pertinent facts underlying this argument are as follows: On April 11, 2011, Seils entered a contingent fee agreement with attorney Peter J. Parks to pursue claims for damages against responsible parties concerning the events occurring on or about May 14, 2010. On May 25, 2011, plaintiff's attorney sent Freedom of Information Act requests to the Michigan Liquor Control Commission and the city of Detroit requesting information related to the alcoholic beverage concession at the 2010 Hoedown Festival. Seils' counsel at some point obtained a copy of the concession agreement between Olympia and the FOPA that stated in its preamble that Olympia had been engaged by CBS Radio and Live Nation to manage food and beverage sales at the 2010 Hoedown at Hart Plaza and that Olympia desired to engage the FOPA to conduct the purchase and sale of alcoholic beverages.

On June 17, 2011, plaintiff's attorney sent a letter to Robert Estabrook of the FOPA, which stated that he intended to pursue a dram shop claim against the FOPA. The letter stated that it was Seils' position that Todd Pink "was clearly visibly intoxicated prior to being furnished intoxicants (beer) by vendors operating under the temporary liquor license issued to the [FOPA] contrary to law." The letter asserted claims of liability under MCL 436.1801 and stated that the letter was intended to afford the FOPA with formal notice under the act of plaintiff's claims.

On August 9, 2011, plaintiff's attorney sent a letter to Robert Stefanski of Olympia Entertainment, which contained a "courtesy copy" of the letter Parks sent to the FOPA. Parks letter to Stefanski stated that Parks had not received a reply from the FOPA or its insurance carrier; the letter did not assert a claim under MCL 436.1801 against Olympia. Also, on August 9, 2011, Parks sent letters identical in content to that sent to Olympia to the Clinton Township Police Department and the Roseville Police Department. The trial court ruled that plaintiff's August 9, 2011 letter to Stefanski, which contained a "courtesy copy" of the notice sent to the FOPA, was sufficient notice to Olympia of plaintiff's dramshop claim against Olympia.

We conclude that the August 9, 2011 letter plaintiff's attorney sent to Robert Stefanski of Olympia, by its plain terms was merely a "courtesy copy" notice of plaintiff's intent to pursue a dramshop claim against the FOPA. It cannot, by its plain terms, be read as a notice of a

dramshop claim against Olympia. The statute clearly and unambiguously requires written notice to "all defendants" and "any defendants" not timely noticed may move for dismissal. MCL 436.1801(4). Because of this clear language, plaintiff's agency argument is without merit.

While the statute does not specify what the notice must contain, read in context with the preceding sentence regarding when "[a]n action" must be brought, it is patent that the written notice must, at a minimum, provide notice to the defendant of the plaintiff's intent to pursue "an action" under the dramshop against the notified defendant. Plaintiff's August 9, 2011 letter did not do so with respect to Olympia. Plaintiff's "[f]ailure to give written notice within the time specified shall be grounds for dismissal of a claim as to any defendants that did not receive [the] notice" required by MCL 436.1801(4). To the extent the trial court relied on a finding that Olympia did not show it suffered any prejudice, we must conclude that the trial court also erred. See *Chambers v Midland Country Club*, 215 Mich App 573, 578; 546 NW2d 706 (1996); *Lautzenheiser v Jolly Bar & Grille, Inc*, 206 Mich App 67, 70; 520 NW2d 348 (1994).

We therefore conclude that plaintiff's failure to give Olympia the timely written notice required by MCL 436.1801(4) provides another alternative basis for reversing the trial court's denial of Olympia's motion for summary disposition and remand for entry of an order granting summary disposition to Olympia regarding plaintiff's dramshop claim.

## V. CONCLUSION

For the reasons discussed in this opinion, we affirm the trial court in Docket No. 315891, but in Docket No. 315901 and Docket No. 316511 we reverse the trial court's denial of summary disposition to defendants as to plaintiff's dramshop complaint. We remand to the trial court for entry of orders in Docket Nos. 315901 and 316511 granting summary disposition to defendants, and for any further proceedings consistent with this opinion. We do not retain jurisdiction. Defendants as the prevailing party in these cases may tax costs under MCR 7.219.

/s/ Mark T. Boonstra
/s/ Jane E. Markey
/s/ Kirsten Frank Kelly

-18-